**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **TRYDEL RESEARCH PTY. LTD.,** ) | |
| ) | **Civil Action No.  1:21-cv-4977** |
| **Plaintiff,** ) | |
| ) | **Judge _____** |
| **v.** ) | |
| **ITW GLOBAL TIRE REPAIR INC.,** ) | **Magistrate Judge _____** |
| ) | |
| **Defendant.** ) | **JURY DEMAND** |
| ) | |

## COMPLAINT FOR ANTITRUST VIOLATIONS

Plaintiff, Trydel Research Pty. Ltd. ("Trydel"), for its Complaint against Defendant ITW

Global Tire Repair Inc. ("ITWGTR"), states as follows:

### I.      Nature of the Case

1.      This is an antitrust civil action for damages and injunctive relief based on violations

of 15 U.S.C. §§ 1 *et seq*.

### II.      Jurisdiction and Venue

2.      This Court has subject-matter jurisdiction over this complaint pursuant to at least

28 U.S.C. §§ 1331, 1337 and 15 U.S.C. §§ 4, 15(a).

3.      This Court has personal jurisdiction over ITWGTR and venue is proper in this

District under 15 U.S.C. §§ 4, 15(a), 22; 28 U.S.C. §§ 1391(b), 1391(c) and 1391(d). ITWGTR

"resides" in this District and has a "Street Address of Principal Executive Office" of 155 Harlem

Avenue, Glenview, Illinois 60025.  *See, e.g.,* Exhibit 1, Secretary of State Records.  ITWGTR

has agents in this District, regularly conducts business in this District, and has committed acts violating

1

the antitrust laws in this District. A substantial part of the events giving rise to the claims asserted occurred in this District including, among other things, engaging in sham litigation in this District (*e.g.*, *ITW Global Tire Repair Inc. v. Hopkins Manufacturing Corporation*, Civil Action No. 18-7165) and entering into unlawful agreement(s) in this District that constitute unauthorized, illegal, and horizontal restraint(s) of trade. On information and belief, one or more of those agreement(s) contained a choice of law provision that provided that Illinois law governs disputes regarding the agreement(s). Documents and witnesses relating to ITWGTR's anti-competitive conduct are located in this District. Each of ITWGTR's Chief Executive Officer, Secretary, Chief Financial Officer, and Directors also is located at 155 Harlem Avenue, Glenview, Illinois 60025. *See, e.g.,* Exhibit 1.

### III.     The Parties

4.      Plaintiff Trydel is a corporation organized and existing under the laws of Australia. Trydel manufactures a variety of tire sealants and tire repair kits, and Trydel sells its products worldwide, including in the United States.

5.      Defendant ITWGTR is a corporation organized and existing under the laws of the State of California and has an address of 155 Harlem Avenue, Glenview, Illinois 60025. ITWGTR does business on a regular basis in the State of Illinois and in this District, including making, using, selling and/or offering to sell tire sealants. ITWGTR has substantial market power in the relevant market(s) and is the largest manufacturer and supplier of tire sealants in the United States. In 2020, ITWGTR had a market share of over 90% for the U.S. tire sealant aftermarket market, and was the only manufacturer and supplier of tire sealants containing glycerin as an antifreeze agent.

#### IV.    Facts Common to All Counts

##### A.    ITWGTR's Market Power in the Relevant Market(s)

6.    When a puncture occurs in a tire, a tire sealant is frequently used. The tire sealant is introduced into the tire to seal up the punctured portion from the inside, thereby ensuring the airtightness of the tire.

7.    Tire valves commonly include a cylindrical valve stem and a valve core that threads into the valve stem. A valve core commonly comprises a circular seal attached to a spring-loaded pin, allowing the tire to be inflated and deflated by depressing the spring-loaded pin.

8.    Some tire sealants can be introduced into the tire directly through the tire valve and valve core, making their use relatively easier and user-friendly. These tire sealants are commonly called "valve-thru" or "VT" tire sealants. Other tire sealants cannot be introduced into the tire without first removing the valve core. These tire sealants are commonly called "valve-out" or "VO" tire sealants.

9.    Tire sealants almost always contain an antifreeze agent. Antifreeze agents are needed in order for the sealants to be effective at cold winter temperatures, sometimes approaching -30°C or lower.

10.    Within the field of tire sealants, the common-sense idea of using glycerin, also referred to as glycerine or glycerol, as an antifreeze has been known for decades. For example, U.S. Patent No. 2,357,650 ("Hall"), which published over 75 years ago, discloses a tire sealant using glycerin as the antifreeze. Hall explains that glycerin acts "to improve the elastic properties of the product, and it also assists in keeping the mixture in a fluid form during extremely cold weather, and prevents evaporation of water during extremely hot weather. Also, by lowering the freezing point during cold weather, it assures the freeflowing of the compound at extremely low

temperatures." Exhibit 2, U.S. Patent No. 2,357,650, Col. 4, Lines 12-20. Throughout the years, the prior art has repeatedly recognized that "glycerol … improves the anti-freezing performance" of tire sealants. Exhibit 3, Chinese Patent No. CN 173073, pg. 4. "Of course, one of the main characteristics imparted to the puncture sealing composition by the polyhydric alcohol is the depression of the freezing point or congealing point of the [tire sealant] composition so that it will remain fluent at low temperature . . . The types of polyhydric alcohols which may be utilized are those containing from 2 to 3 carbon atoms and typically include glycerol . . . ." Exhibit 4, U.S. Patent No. 3,352,696, Col. 4, Lines 18-36.

11.     Glycerin has long been known and used as an antifreeze agent in tire sealants because it is inexpensive, environmentally safe, nonpolluting, biodegradable, and relatively easy to flow across a wide range of temperatures:

> The extremely wide range of uses for glycerine is due in large measure not to a single property, but to its unique combination of properties.
>
> Nature made glycerol the most widely distributed of the polyhydric alcohols, as combined in fats and other lipids essential to life processes. Derivatives dependent on its chemical structure have now been extended to virtually every field of research and technology, from explosives to emulsifiers.
>
> *Glycerine* (sometimes *glycerin)* is the term most often applied to the commercial product, which usually contains a small percentage of water. *Glycerol* (chemically, also 1,2,3- *propanetriol)* refers to the chemical compound and content in a formulation … But over and above its chemical combinations, pure glycerine offers the formulator a liquid with a fortuitous balance of physical properties, bland, viscous, stable, hygroscopic and widely compatible. In the area of products for personal use it is clear, odorless and recognized as safe. It prevents freezing and promotes long shelf life.

Exhibit 5, Physical Properties of Glycerine and Its Solutions, pg. 2.

12.     Glycerin is a "prized ingredient among chemists and formulators," its solvent power and solubility characteristics similar to that of water have caused glycerin to be

regarded as one of the most valuable compounding ingredients available to chemists and formulators. *See* Exhibit 6, Glycerine: An Overview, pg. 8. Glycerin will blend readily with virtually any other ingredient, with rubber latex, another common tire sealant ingredient, being no exception.

13.     ITWGTR promotes the benefits of glycerin on its website, stating that glycerin is "hypoallergenic," has "complete bio-degradability," "doesn't dry out when exposed to air like existing [propylene glycol] or [ethylene glycol] formulations allowing for longer shelf life in tires," and that "[g]lycerin is the most environmentally friendly of all tire sealants and is non-hazardous to humans." Exhibit 7, ITWGTR Webpage Excerpt.

14.     There are known advantages to using glycerin instead of other conventional antifreeze agents, such as ethylene glycol and propylene glycol. For example, ethylene glycol is no longer an acceptable antifreeze agent in tire sealants due to its toxicity and environmental issues. An advantage to using glycerin instead of propylene glycol is that the cost to manufacture the tire sealant can be reduced because glycerin is substantially less expensive than propylene glycol. The cost can be substantially reduced if glycerin comprises a relatively larger percentage of the overall sealant. By using glycerin as an antifreeze in tire sealants instead of propylene glycol, the manufacturer can simultaneously reduce its prices and increase its profits. The average commodity price of glycerin from 2007 to 2018 was $600 per metric ton. By comparison, the average commodity price of propylene glycol was $1,800 per metric ton. Thus, the use or glycerin instead of propylene glycol resulted in a 300% cost saving in antifreeze, the major cost component.

15.     For purposes of this Complaint, the relevant market(s) is/are (a) the OE or "original equipment" tire sealant market, and/or (b) the tire sealant aftermarket.

16.     The OE market comprises automobile manufacturers who include tire sealants with the sale of new automobiles. Sometimes a tire sealant and a tire repair kit are included with the sale of a new automobile instead of a spare tire, for example, to save space and weight.  Sales in the OE market also include sales of replacement tire sealants if the tire sealant originally sold with the automobile is used, damaged, or expired.

17.     A customer in the OE market (*e.g.*, an automobile manufacturer) is willing to purchase tire sealants from sellers located outside the customer's country; and a seller in the OE market (*e.g.*, ITWGTR) is willing to sell tire sealants to customers located outside the seller's country. This stems from international nature of automobile sales (*e.g.*, that U.S.-made automobiles are sold outside of the United States, and non-U.S.-made automobiles are sold in the United States), and that automobile manufacturers source material for their automobiles from various countries, not just their own.

18.     Customers in the OE market do not consider VO tire sealants interchangeable with VT tire sealants. Customers in the OE market insist that the sealant be a VT tire sealant. Thus, one relevant market is the global tire sealant OE market for VT tire sealants.

19.     The tire sealant aftermarket comprises consumers who purchase and use tire sealants in the automotive and industrial sectors (*e.g.*, automobiles, ATVs, commercial vehicles). Although some consumers prefer VT tire sealants over VO tire sealants, consumers generally consider VO tire sealants interchangeable with VT tire sealants. VO tire sealants almost always include, with the sealant, a tool for removing the valve core as well as instructions for how to remove the valve core. The cost to the seller of including the tool for removing the valve core is virtually nothing. For example, the tool can consist of a small piece of molded plastic.

6

20.     Tire sealants in the aftermarket are sold in brick-and-mortar retail stores, such as Walmart and various automotive supply stores. Consumers prefer to purchase tire sealants relatively close to where they live, just like most other retail purchases. Consumers in the United States do not look outside of the United States when purchasing tire sealants. Thus, another relevant market is the U.S. tire sealant aftermarket for VO and VT tire sealants.

21.     The market for tire sealants is hundreds of millions of dollars annually, and ITWGTR is the largest manufacturer and supplier of tire sealants in the United States. ITWGTR has boasted of its dominance in numerous public statements. For example, ITWGTR's website states that it is the "Global Leader in Tire Repair Technology." Exhibit 7.

22.     ITWGTR sells a variety of tire sealants, including tire sealants, under its "Slime" brand. ITWGTR boasts that its "Slime" brand of tire sealant "is the most widely distributed tire sealant in the world" and that its "Slime" brand products can be found in over 50,000 retail distribution points worldwide." Exhibit 7, pg. 3

23.     ITWGTR has been very successful in its efforts to monopolize the relevant market(s). In 2020, the OE market was highly concentrated, consisting of four dominant sellers: ITWGTR, Dunlop Tech GmbH, TEK Global, S.R.L., and Active Tools International Ltd.

24.     In 2020, ITWGTR had a market share of over 90% for the U.S. aftermarket, and was the only manufacturer and supplier of tire sealants containing glycerin as an antifreeze agent.

25.     ITWGTR's monopoly and substantial market power in the relevant market(s) has not occurred by superior acumen, innovation, skill, foresight, or industry, or by proper functioning of the market, or by market conditions. Instead, as explained below, it has occurred as the result of ITWGTR's purposeful abuse of the patent system and the judicial process, and entering into unlawful agreement(s) that constitute unauthorized, illegal, and horizontal restraint(s) of trade.

B.     ITWGTR's U.S. Patent No. 7,388,041 and The Prior Art

26.     ITW states on its website that it "holds patents for the use of [g]lycerin as an antifreeze agent in tire sealants." Exhibit 7.

27.     ITWGTR is the owner of U.S. Patent No. 7,388,041 ("the '041 Patent"), which issued June 17, 2008. Attached as Exhibit 8 to this Complaint is a true and accurate copy of the '041 Patent. The '041 Patent is entitled "Puncture Sealing Agent for a Tire and Process for Producing the Same."

28.     The patent application that ultimately issued as the '041 Patent, U.S. Patent Application No. 11/389,278 ("the '278 Application"), was filed by Accessories Marking, Inc. ("AMI") on March 24, 2006. Attached as Exhibit 9 to this Complaint is a true and accurate copy of the '278 Application and its prosecution file history.

29.     The named inventors of the '041 Patent are Steven Cegelski and Shees Sulemanji. Timothy Lohse, an attorney at the law firm of DLA Piper, filed and prosecuted the '278 Application.

30.     Cegelski and Sulemanji purportedly invented a tire sealant containing rubber latex, glycerin as an antifreeze agent, and other conventional additives. They also purportedly invented a process for making a tire sealant containing rubber latex, glycerin as an antifreeze agent, and other conventional additives.

31.     Cegelski's and Sulemanji's purported invention of a tire sealant and process for making the tire sealant was no invention at all, because they copied the tire-sealant recipe and the process for making the tire sealant from the prior art.

32.     With respect to the ingredients of the tire sealant, claim 1 of the '041 Patent is simple: it requires a tire sealant containing rubber latex and glycerin as an antifreeze agent. The prior art, however, is replete with examples of tire sealants containing rubber latex and glycerin as an antifreeze agent.

33.     For example, prior art Swiss Patent No. 286505 ("Morand"), which published in the early 1950s, is entitled "Product for Introduction into Tire Inner Tubes in Order to Seal Punctures." Exhibit 10, Swiss Patent No. 286505, pg. 1. Morand discloses a tire sealant containing a rubber latex, glycerin, and other conventional additives.

34.     Prior art U.S. Patent No. 5,856,376 ("Wong") is entitled "Tire Puncture Sealant." Exhibit 11, U.S. Patent No. 5,856,376, Col. 1, Line 1. Wong discloses a tire sealant containing a rubber latex, glycerin, and other conventional additives.

35.     Prior art Chinese Patent No. CN 1062363 ("Haifeng") is entitled "Special-Effect Automatic Tire Sealant." Exhibit 12, Chinese Patent No. CN 1062363, pg. 1. Haifeng discloses a tire sealant containing a rubber latex, glycerin as an antifreeze agent, and other conventional additives.

36.     Prior art Chinese Patent No. CN 173073 ("Guihe") is entitled "Auto Tire Repair Glue." Exhibit 3, Chinese Patent No. CN 173073 pg. 1. Guihe discloses a tire sealant containing a rubber latex, glycerin, and other conventional additives.

37.     With respect to the process for making the tire sealant, claim 17 of the '041 Patent recites a two-step method for mixing conventional ingredients. Exhibit 8, Col. 10, Lines 52-55. The first step is mixing rubber latex with an adhesive. The second step is mixing glycerin with the rubber latex/adhesive mixture.

38.     The two-step mixing process, however, was well-known in the prior art.

9

39.     For example, Haifeng discloses the same two-step method for making a tire sealant by mixing conventional ingredients: "The styrene-butadiene latex [*i.e.*, rubber latex] was placed in a mixing kettle with a stirrer, the polyvinyl alcohol [*i.e.*, adhesive agent] and the sodium nitrite were gradually added under constant stirring, the glycerin [*i.e.*, antifreeze agent] was finally added, and the mixture was uniformly stirred, and bottled to obtain the finished product." Exhibit 12, pg. 4.

40.     Similarly, prior art U.S. Patent No. 6,864,305 ("Kishida") is entitled: "Puncture Sealing Agent for a Tire, and Process for Producing the Same." Exhibit 13. Kishida discloses a two-step "process for producing the above-mentioned puncture sealing agent . . . ." *Id*. at Col. 2, Lines 16-17. The first step includes "pouring/mixing the adhesive agent into/with the rubber latex under stirring to prepare an adhesive agent poured/mixed solution . . . ." *Id*. at Col. 2, Lines 18-21. The second step includes: "pouring/mixing an aqueous propylene glycol solution [*i.e.*, the antifreeze agent"] wherein the propylene glycol is diluted with water into/with the adhesive agent poured/mixed solution under stirring." *Id* at Col. 2, Lines 22-25.

41.     Before 2006, and many years before AMI filed the '278 Application, AMI manufactured and marketed tire sealants under the "Slime" brand name that included substantially all of the ingredients of the tire sealant disclosed and claimed in the '041 Patent.

42.     Claim 1 of the '041 Patent recites a rubber latex and an antifreeze agent wherein a ratio of the anti-freezing agent to the total weight of the tire sealant is between 5%–75% by weight. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed its "Slime" tire sealants containing rubber latex and an antifreeze agent with a weight ratio of about 50%.

10

43.     Claim 2 of the '041 Patent depends from claim 1, and thus includes all the requirements of claim 1. Claim 2 of the '041 Patent further requires an adhesive agent. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed its "Slime" tire sealants that included an adhesive agent.

44.     Claim 3 of the '041 Patent depends from claim 1, and thus includes all the requirements of claim 1. Claim 3 of the '041 Patent further requires an anti-corrosion agent. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed its "Slime" tire sealants that included an anti-corrosion agent.

45.     Claim 4 of the '041 Patent depends from claim 1, and thus includes all the requirements of claim 1. Claim 4 of the '041 Patent further requires one or more fibers and fibrous materials that enhance sealing capability of the tire sealant. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed its "Slime" tire sealants that included one or more fibers and fibrous materials that enhance sealing capability of the tire sealant.

46.     Claim 5 of the '041 Patent depends from claim 1, and thus includes all the requirements of claim 1. Claim 5 of the '041 Patent further requires fibers having a size of between 1 micron and 150 microns. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed its "Slime" tire sealants that included fibers with a size between 1 and 150 microns.

47.     Claim 9 of the '041 Patent depends from claim 1, and thus includes all the requirements of claim 1. Claim 9 of the '041 Patent further requires a surfactant. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed "Slime" tire sealants that included a surfactant.

48.　　Claim 26 of the '041 Patent requires one or more fibers, a thickening agent, glycerin as an anti-freezing agent, rubber latex, an adhesive agent, and one or more rubber chunks. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed its "Slime" tire sealants that included one or more fibers, a thickening agent, an anti-freezing agent, rubber latex, an adhesive agent, and one or more rubber chunks.

49.　　Claim 27 of the '041 Patent depends from claim 26, and thus includes all the requirements of claim 26. Claim 27 of the '041 Patent further requires a thickening agent which could be a clay thickener. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed its "Slime" tire sealants that included a clay thickener.

50.　　Claim 28 of the '041 Patent depends from claim 27, and thus includes all the requirements of claims 26 and 27. Claim 27 of the '041 Patent further requires that the clay thickener could be a Bentonite clay or an Atapulgite clay. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed its "Slime" tire sealants that included a clay thickener that was Bentonite clay and/or Atapulgite clay.

51.　　Claim 29 of the '041 Patent depends from claim 26, and thus includes all the requirements of claim 26. Claim 29 of the '041 Patent further requires that the one or more fibers form an interlocking network thereby clotting a puncture hole and stopping outbound air passage from a tire into which the puncture sealing agent is inserted. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed its "Slime" tire sealants that included one or more fibers that form an interlocking network thereby clotting a puncture hole and stopping outbound air passage from a tire into which the puncture sealing agent is inserted.

52.     Claim 30 of the '041 Patent depends from claim 26, and thus includes all the requirements of claim 26. Claim 30 of the '041 Patent further requires a corrosion inhibitor. Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed its "Slime" tire sealants that included a corrosion inhibitor.

C.     The '041 Patent Was Procured by Fraud on the United States Patent Office

53.     As named inventors of the '041 Patent, Cegelski and Sulemanji, owed the United States Patent and Trademark Office ("USPTO") a duty to disclose information material to patentability under 37 CFR § 1.56—a duty each violated by failing to disclose material prior art during prosecution of the '041 Patent.[1] Cegelski and Sulemanji made the deliberate decision to withhold material prior with intent to deceive the USPTO into granting the '041 Patent.

**Cegelski and Sulemanji Intentionally Concealed the Invalidating "Slime" Tire-Sealant Prior Art from the U.S. Patent & Trademark Office**

54.     Cegelski and Sulemanji had detailed knowledge of the materiality of the prior art "Slime" tire sealants before and throughout the duration of the prosecution of the '041 Patent, but they deliberately withheld with deceptive intent to secure issuance of the '041 Patent. The '041 Patent would not have issued had Cegelski and Sulemanji disclosed their knowledge of the existence and ingredients of the prior art "Slime" tire sealants to the USPTO.

---

[1]     37 CFR § 1.56(a) provides, in relevant part: "[a] patent by its very nature is affected with a public interest … Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability … [N]o patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct …"

55. Cegelski and Sulemanji were each aware of the prior art "Slime" tire sealants prior to the filing of the '278 Application.

56. The ingredients of the prior art "Slime" tire sealants were known to Cegelski and Sulemanji. Cegelski, for example, purportedly invented the "Slime" tire sealant. *See* Exhibit 14, pg. 2 ("Steve Cegelski of Grover Beach tinkered in his garage to invent the bright green, nontoxic tire sealant Slime"). Sulemanji was AMI's Director of Chemistry, and he was responsible for developing tire sealants, all tire sealant validations for AMI's OE market business, and all daily quality control reporting for tire sealants.

57. Cegelski and Sulemanji knew that the prior art "Slime" tire sealants included at least substantially all of the ingredients of the tire sealant disclosed and claimed in the '041 Patent.

58. Cegelski and Sulemanji knew that the prior art "Slime" tire sealants contained rubber latex.

59. Cegelski and Sulemanji knew that the prior art "Slime" tire sealants contained an antifreeze agent.

60. Cegelski and Sulemanji knew that the prior art "Slime" tire sealants contained an anti-corrosion agent.

61. Cegelski and Sulemanji knew that the prior art "Slime" tire sealants contained one or more fibers and fibrous materials.

62. Cegelski and Sulemanji knew that the prior art "Slime" tire sealants contained a surfactant.

63. Cegelski and Sulemanji knew that the prior art "Slime" tire sealants contained a thickening agent.

64. Cegelski and Sulemanji knew that the prior art "Slime" tire sealants contained an adhesive agent.

65. Cegelski and Sulemanji knew that the prior art "Slime" tire sealants contained one or more rubber chunks.

66. Cegelski knew that the prior art "Slime" tire sealants contained a thickening agent that was Bentonite clay and Atapulgite clay.

67. Cegelski and Sulemanji knew that the prior art "Slime" tire sealants contained one or more fibers that form an interlocking network thereby clotting a puncture hole and stopping outbound air passage from a tire into which the puncture sealing agent is inserted.

68. Despite Cegelski and Sulemanji knowing all of the ingredients of the prior art "Slime" tire sealants, they withheld this information from the USPTO during the prosecution of the '041 Patent, as they never disclosed the prior art "Slime" tire sealants nor their material knowledge of them at any point between the filing of the '278 Application for and issuance of the '041 Patent.

69. Cegelski and Sulemanji were aware that the "Slime" tire sealants were on sale prior to March 26, 2005, and therefore constituted prior art under pre-AIA 35 U.S.C. § 102(b). Cegelski and Sulemanji were aware that the prior art "Slime" tire sealants were highly material to the patentability of the '041 Patent because each was aware that the prior art "Slime" tire sealants included, among other things, a rubber latex, an antifreeze agent, an anti-corrosion agent, one of more fibers and fibrous materials, and a surfactant, a thickening agent, an adhesive agent, and rubber chunks. Indeed, as illustrated in the screen capture from the "Slime" web site, "Slime" is even marketed as being "patented" (*i.e.,* presumably the ''041 Patent) and as having been on-sale since 1989. *See* https://www.slime.com/uk/products/lawn-garden/sealants.

15



70.     On June 16, 2006, Cegelski and Sulemanji each signed a declaration under **penalty of perjury** that was submitted with the '278 Application in which they declared that they "have reviewed and understand the contents of the above-identified specification" and that they each individually "acknowledge the duty to disclose information which is material to patentability." Exhibit 15, pg. 2.

### Cegelski and Sulemanji Intentionally Concealed from the U.S. Patent and Trademark Office the Fact that the '278 Application Was Literally Copied from a Prior Art Patent

71.     Cegelski's and Sulemanji's purported invention of a "puncture sealing agent" and "process for producing the sealing agent" containing glycerin as the antifreeze agent was no invention at all, but instead merely the product of blatant copying of the prior-art Kishida patent.

72.     Approximately 85 percent of the text of the specification of the '041 Patent is **identical** to the prior-art Kishida specification.

73.    Cegelski, Sulemanji, and/or Lohse **copied, verbatim** much of the prior-art Kishida patent, and in most places, the **only** change made to Kishida's written description was replacing one conventional antifreeze agent ("propylene glycol") with another conventional antifreeze agent ("glycerin").

74.    For example, lines 7 through 18 of page 9 of the '278 Application, which became lines 21 through 39 of the '041 Patent, are identical to lines 35 through 54 of column 5 of Kishida, except that the '041 Patent replaces "propylene glycol" in Kishida with "glycerin."

| Propylene glycol has a nature that it is mixed with the rubber latex 1 with more difficulty than ethylene glycol or the like, which is generally known as an antifreezing agent. Therefore, when propylene glycol is incorporated, at a high concentration, into the antifreezing agent or when the pouring speed thereof is large, propylene glycol which has not yet been blended irritates the rubber particles so that rubber aggregation lumps trends to be generated. For this reason, in the present example, propylene glycol is made to the aqueous solution 4, and is poured and mixed in the state that it is easily mixed with the rubber latex 1.

The aggregation of the rubber particles can be suppressed and the generation of the rubber aggregation lumps can be effectively suppressed by synergetic effects from the fact that the adhesive agent 2 is beforehand poured/mixed into/with the rubber latex 1 to lower the rubber concentration and the fact that propylene glycol is poured/mixed, in an aqueous solution state, into/with the adhesive agent poured/mixed solution 3, which is a mixed solution of the rubber latex and the adhesive agent. | Glycerin has a nature that it is mixed with the rubber latex 1 with more difficulty than ethylene glycol or the like, which is generally known as an anti-freezing agent. Therefore, when glycerin is incorporated, at a high concentration, into the anti-freezing agent or when the pouring speed thereof is large, glycerin which has not yet been blended irritates the rubber particles so that rubber aggregation lumps trends to be generated. For this reason, in the present example, glycerin is made to the aqueous solution 4, and is poured and mixed in the state that it is easily mixed with the rubber latex 1. The aggregation of the rubber particles can be suppressed and the generation of the rubber aggregation lumps can be effectively suppressed by synergetic effects from the fact that the adhesive agent 2 is beforehand poured/mixed into/with the rubber latex 1 to lower the rubber concentration and the fact that glycerin is poured/mixed, in an aqueous solution 3, which is a mixed solution of the rubber latex and the adhesive agent. |
|---|---|
| **Kishida (column 5, lines 35–54)**<br>*issued March 8, 2005* | **'041 Patent (column 6, lines 21–39)**<br>*filed March 24, 2006 by ITWGTR's predecessor* |

75.    This portion of the '278 Application pertains to the "mixing" process that Cegelski and Sulemanji purported to invent. In reality, they did not invent anything, but instead merely **copied from Kishida word-for-word, including copying the typographical error "trends" instead of "tends."**

76.    The Kishida mixing process for combining propylene glycol and latex is unusually complicated. To prevent propylene glycol from causing latex to curdle and form aggregated clumps of coagulated solid rubber, it requires pre-treating with controlled pouring rates and mixing

speeds. However, the same mixing procedure is unnecessary to combine glycerin and latex because glycerin is highly miscible with latex. The statements in the '041 Patent at column 6, lines 21–50 that glycerin is difficult to mix with rubber latex is false.

77. As another example, lines 16–20 and 33–37 of column 1 and lines 14–34 of column 3 of the '041 Patent are *identical* to lines 14–17 and 31–42 of column 1 and lines 49–64 of column 2 of Kishida, except for a handful of superfluous words added by Cegelski, Sulemanji, and/or Lohse to the plagiarized portions of Kishida.

| | |
|---|---|
| When a puncture is generated in a tire, a puncture sealing agent is frequently used. The sealing agent is an agent which is poured into the tire to seal up the punctured portion from the inside, thereby ensuring the airtightness of the tire.<br><br>**Kishida (column 1, lines 14–17)**<br>*issued March 8, 2005* | When a puncture occurs in a tire, a puncture sealing agent is frequently used. The sealing agent is an agent which is introduced into the tire to seal up the punctured portion from the inside, thereby ensuring the airtightness of the tire so that the tire can be refilled with air.<br><br>**'041 Patent (column 1, lines 16–20)**<br>*filed March 24, 2006 by ITWGTR's predecessor* |
| It is presumed that the creamy material a is generated by the following mechanism: in the puncture sealing agent, which is a latex wherein rubber particles and adhesive agent particles are dispersed and floated in an aqueous ethylene glycol solution by ionic repulsive force between the particles and a surfactant, the gravity of the dispersed particles is smaller than that of the aqueous ethylene glycol solution, which is a medium; therefore, the respective rubber particles gradually rise up (float up) in the medium by the action of gravity and the rising particles form a particle-concentrated layer near the surface, whereby the puncture sealing agent is transformed to the creamy material.<br><br>**Kishida (column 1, lines 31–42)**<br>*issued March 8, 2005* | The creamy material is presumably generated by the following mechanism: in the puncture sealing agent, which is a latex wherein rubber particles and adhesive agent particles are dispersed and floating in an aqueous ethylene glycol solution by ionic repulsive force between the particles and a surfactant, the gravity of the dispersed particles is smaller than that of the aqueous ethylene glycol solution, which is a medium; therefore, the respective rubber particles gradually rise up (float up) in the medium by the action of gravity and the rising particles form a particle-concentrated layer near the surface, whereby the puncture sealing agent is transformed to the creamy material. Thus, it is desirable to provide a puncture sealing agent that overcomes this problem and limitation of the typical puncture sealing agent and it is to this end that the present invention is directed.<br><br>**'041 Patent (column 1, lines 33–47)**<br>*filed March 24, 2006 by ITWGTR's predecessor* |

18

As the rubber latex used in the puncture sealing agent, a natural rubber latex having a high sealing ability is preferably used. The so-called deprotein natural rubber latex, which is a latex obtained by removing proteins from the natural rubber latex, is more preferably used since corrosion thereof can be suppressed because of a smaller amount of ammonia and corrosion and damage of a steel cord and generation of irritating odor, resulting from ammonia, are prevented. It is preferred to use, as the deprotein natural rubber latex, a latex wherein the nitrogen content, which is a conversion criterion of the protein content by percentage, is reduced to 0.1% or less by weight of rubber solid content. The protein content in ordinary natural rubber latexes is from about 0.2 to 0.3% by weight, as a value converted to the nitrogen content. The nitrogen content is a value obtained by measurement according to a Kjeldahl method.

**Kishida (column 2, lines 49–64)**

*issued March 8, 2005*

---

In the first embodiment, the rubber latex used for the puncture sealing agent may be natural rubber or synthetic rubber. However, a natural rubber latex having a high sealing ability is preferably used, while synthetic latex may be used instead of the natural latex or in combination with the natural latex. More preferably, a so-called deprotein natural rubber latex, which is a latex obtained by removing proteins from the natural rubber latex, is used since corrosion thereof can be suppressed because of a smaller amount of ammonia that reduces the corrosion and damage of a steel cord and the reduces the generation of the irritating odor resulting from ammonia. Therefore, it is preferred to use, as the deprotein natural rubber latex, a latex wherein the nitrogen content, which is a conversion criterion of the protein content by percentage, is reduced to 0.1% or less by weight of rubber solid content. The protein content in ordinary natural rubber latexes is from about 0.2 to 0.3% by weight, as a value converted to the nitrogen content. The nitrogen content is a value obtained by measurement according to a well known Kjeldahl method.

**'041 Patent (column 3, lines 14–34)**

*filed March 24, 2006 by ITWGTR's predecessor*

| Kishida (column 4, lines 25–59) issued March 8, 2005 | '041 Patent (column 5, line 65-column 5, line 32 filed March 24, 2006 by ITWGTR's predecessor |
|---|---|
| A surfactant may be added, as a stabilizer, to the puncture sealing agent. As this surfactant, an anionic surfactant, an ampholytic surfactant, a special carboxylic acid type surfactant, or the like may be used. An aliphatic acid salt having 9 to 18 carbon atoms is particularly preferred since the salt exhibits the effect of suppressing coagulation in bulb cores without lowering the sealing ability.  Examples of the aliphatic acid in the aliphatic acid salt having 9 to 18 carbon atoms include capric acid having 10 carbon atoms, lauric acid having 12 carbon atoms, myristic acid having 14 carbon atoms, palmitic acid having 16 carbon atoms, and stearic acid, oleic acid, linolic acid and linoleic acid having 18 carbon atoms. Examples of the salt include sodium salt, potassium salt, ammonium salt and triethanolamine salt.  Among these examples, ammonium laurate and triethanolamine laurate are particularly preferred since they can exhibit superior coagulation-suppressing effect and have a characteristic of improving the coagulation-suppressing effect in proportion to the content thereof.  Ammonium laurate or triethanolamine laurate may be used in the state that it is mixed with a different surfactant. In this case, this different surfactant is preferably a surfactant made of an aliphatic acid salt having 9 to 18 carbon atoms. When ammonium laurate is produced, ammonia is necessary. Thus, ammonium laurate trends to give an ammonia odor. In view of odors, therefore, triethanolamine laurate is more preferably used.  The ratio of the surfactant to the total weight of the puncture sealing agent is from 0.4 to 2.0% by weight. If the ratio is less than 0.4% by weight, the stability of the puncture sealing agent becomes insufficient. As a result, the effect of suppressing the generation of the creamy material is damaged, or the agent trends to coagulate easily in bulb cores. On the other hand, if the ratio is more than 2.0% by weight, the sealing ability itself may deteriorate. | As discussed above, a surfactant may be added, as a stabilizer, to the puncture sealing agent. The surfactant agent may be an anionic surfactant, an ampholytic surfactant, a special carboxylic acid type surfactant or the like. Preferably, an aliphatic acid salt having 9 to 18 carbon atoms may be used as the surfactant agent since the salt exhibits the effect of suppressing coagulation in bulb cores without lowering the sealing ability of the puncture sealing agent. Several examples of the aliphatic acid in the aliphatic acid salt having 9 to 18 carbon atoms may include capric acid having 10 carbon atoms, lauric acid having 12 carbon atoms, myristic acid having 14 carbon atoms, palmitic acid having 16 carbon atoms, and stearic acid, oleic acid and linoleic acid having 18 carbon atoms. Several examples of the salt may include sodium salt, potassium salt, ammonium salt and triethanolamine salt.  For the surfactant agent, ammonium laurate and triethanolamine laurate are particularly preferred since they exhibit superior coagulation-suppressing effect and have a characteristic of improving the coagulation-suppressing effect in proportion to the content thereof. Ammonium laurate or triethanolamine laurate may be used in the state that it is mixed with a second surfactant agent. In this case, the second surfactant agent is preferably a surfactant made of an aliphatic acid salt having 9 to 18 carbon atoms. Ammonium laurate has an ammonia odor so that triethanolamine laurate is more preferably used.  The ratio of the surfactant agent to the total weight of the puncture sealing agent is from 0.4 to 2.0% by weight. If the ratio is less than 0.4% by weight, the stability of the puncture sealing agent becomes insufficient. As a result, the effect of suppressing the generation of the creamy material is damaged, or the agent tends to coagulate easily in bulb cores. On the other hand, if the ratio is more than 2.0% by weight, the sealing ability of the puncture sealing agent may deteriorate. |

78.    In addition to copying the written description of Kishida, Cegelski, Sulemanji, and/or Lohse substantially *copied* at least one claim from Kishida into the '278 Application, which issued as the '041 Patent. For example, claim 17 of the '041 Patent, which recites a two-step process for mixing ingredients to make a tire sealant, was substantially copied from claim 4 from Kishida, which also recites a two-step process for mixing ingredients to make a tire sealant. Claim

17 of the '041 Patent and claim 4 of Kishida require mixing rubber latex with an adhesive, and then mixing a conventional antifreeze agent with the rubber latex/adhesive mixture.

| | |
|---|---|
| 4. A process for producing a puncture sealing agent composition for a tire, comprising a rubber latex, an adhesive agent, and an antifreezing agent, wherein said antifreezing agent comprises propylene glycol, and further wherein the ratio of the propylene glycol to the total weight of the puncture sealing agent composition is 20 to 40% by weight, said process comprising the steps of<br><br>pouring/mixing the adhesive agent into/with the rubber latex under stirring to yield a mixture of the adhesive agent and said latex, and<br><br>pouring/mixing an aqueous propylene glycol solution into/with the mixture of said adhesive agent of said latex under stirring.<br><br>**Kishida (claim 4)**<br>*issued March 8, 2005* | 17. A method for producing a puncture sealing agent wherein the puncture sealing agent has a rubber latex, an adhesive agent, and an anti-freezing agent, wherein said anti-freezing agent comprises glycerin and the ratio of the glycerin to the total weight of the puncture sealing agent composition is 5 to 50% by weight, the method comprising:<br><br>mixing an adhesive agent with a rubber latex while stirring to yield a mixture; and<br><br>mixing a glycerin solution with the mixture to form the puncture sealing agent.<br><br>**'041 Patent (claim 17)**<br>*filed March 24, 2006 by ITWGTR's predecessor* |

79.      Section 2001.06(d) The Manual of Patent Examination and Procedure ("MPEP") provides:

> Where claims are copied or substantially copied from a patent, 37 CFR 1.607(c) requires applicant shall, at the time he or she presents the claim(s), identify the patent and the numbers of the patent claims. Clearly, the information required by 37 CFR 1.607(c) as to the source of copied claims is material information under 37 CFR 1.56 and failure to inform the USPTO of such information may violate the duty of disclosure.

80.      Cegelski, Sulemanji, and/or Lohse deliberately misled the USPTO into believing the Cegelski and Sulemanji were inventors of a two-step process for mixing a tire sealant that was, in reality, conceived by the named inventors of Kishida. In doing so, Cegelski and Sulemanji secured for themselves (and AMI) through substantial copying of a claim from the prior art into the patent claims in the '041 Patent and withheld this fact from the USPTO.

81.      Cegelski, Sulemanji, and Lohse did not inform the USPTO that the majority of the specification of the '041 Patent was copied, verbatim from Kishida.

21

82. Cegelski, Sulemanji, and Lohse did not inform the USPTO that a claim covering a two-step process for producing a tire sealant was substantially copied from Kishida and included in the '278 Application, which issued as the '041 Patent.

83. Cegelski, Sulemanji and Lohse never identified any of the named inventors of Kishida as inventors or co-inventors on the '041 Patent.

84. Cegelski, Sulemanji, and/or Lohse committed inequitable conduct before the USPTO by intentionally withholding their copying of the prior art with intent to deceive the USPTO into granting the '041 Patent.

85. Cegelski, Sulemanji and/or Lohse committed inequitable conduct before the USPTO by intentionally withholding the fact that named inventors of Kishida invented the two-step mixing process that included mixing rubber latex with an adhesive, and then mixing an antifreeze agent with the rubber latex/adhesive mixture.

86. Cegelski and Sulemanji committed inequitable conduct by making the false statements in the '041 Patent at column 6, lines 21–50 that glycerin is difficult to mix with rubber latex. The statements are false because it is a scientific fact, and was well-known before 2006, that glycerin mixes easily with rubber latex. Glycerin is known to be extremely versatile and compatible with myriad substances. *See* Exhibit 5, pg. 2. Cegelski and Sulemanji copied column 6, lines 21–50 of the '041 Patent from Kishida replacing "propylene glycol" with "glycerin" with deceptive intent to secure issuance of the '041 Patent.

D.  AMI Becomes ITWGTR

87. In or around 2010, ITWGTR's parent company, Illinois Tool Works Inc., acquired AMI, including the '041 Patent. Illinois Tool Works, Inc. has a principal place of business in this District, namely in Glenview, Illinois.

22

88.     In or around 2015, AMI's name was changed to ITW Global Tire Repair Inc. ITW Global Tire Repair Inc.'s filings with the California Secretary of State identify its "Address of Principal Executive Office" as being in this District, namely 155 Harlem Avenue, Glenview, Illinois 60025. Exhibit 1.

89.     ITWGTR is bound by AMI's conduct and statements made during prosecution of the '278 Application.

E.     Trydel's Relationship with Non-Party Hopkins Manufacturing

90.     Plaintiff Trydel makes and supplies tire sealants to nonparty Hopkins Manufacturing Corporation ("Hopkins"), who sells Trydel-made tire sealants in the United States under Hopkins's Bell®, Genuine Victor™, and Monkey Grip™ brands. Hopkins has an operational and marketing facility located in the District, namely at 6700 Wildlife Way, Long Grove, Illinois 60047.

91.     Before 2016, Trydel developed a proprietary, particle-based VT tire sealant which included glycerin. Trydel's patented tire sealant is less messy and easier to clean up and dispose of than traditional tire sealants. Trydel's patented tire sealant did not create the same mess inside the tire as traditional tire sealants. Trydel's patented tire sealant is less messy inside the tire than ITWGTR's "Slime" tire sealant. Unfortunately, ITWGTR's exclusionary conduct has limited Trydel's ability to sell its proprietary, particle-based VT tire sealant to customers.

92.     Trydel began supplying Hopkins with this patented tire sealant in August 2018, and Hopkins began selling this sealant shortly thereafter, including Hopkins's Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant."

93.     Trydel exhibited its tire sealants that contain glycerin at the Automechanika Frankfurt international trade fair in 2016. The Automechanika Frankfurt international trade fair is

one of the leading trade shows for the automotive service industry, drawing thousands of exhibitors and tens of thousands of visitors.

94. On information and belief, ITWGTR, or an affiliate of ITWGTR, or an affiliate of ITWGTR's parent corporation Illinois Tool Works Inc.—such as ITW Global Investments or ITW Global Brands—attended the 2016 Automechanika Frankfurt international trade fair and learned of Trydel's tire sealants containing glycerin.

95. In 2017, ITWGTR was trying to increase its market share of tire sealants in the OE market. Trydel's patented tire sealant contained substantially less latex than the tire sealant sold by ITWGTR in the OE market, enabling Trydel's patented tire sealant to be manufactured at a significant cost savings compared to the tire sealant sold by ITWGTR in the OE market.

96. Also in 2017, ITWGTR was enjoined by the U.S. District Court for the Northern District of California from selling certain tire repair kits and that were found to infringe one or more patents belonging to TEK Corporation and/or TEK Global, S.R.L. (collectively "TEK") and directed to tire repair kits. Permanent Injunction, *TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, No. 11-774, ECF No. 564 (N.D. Cal. Aug. 11, 2017).

97. Also in 2017, one or more representatives of Trydel met in Zurich, Switzerland, with William Keller, who is a Managing Director at ITWGTR and responsible for ITWGTR's sales in the OE market. Trydel representatives discussed with Mr. Keller the possibility of Trydel and ITWGTR coming to a business arrangement in which Trydel would supply ITWGTR with tire sealants and repair kits for sale in the OE market and that would not infringe TEK's patents. During this meeting, Mr. Keller and/or ITWGTR became aware of Trydel's tire sealants that contain glycerin.

24

F.     ITWGTR Sues Hopkins Right Before the 2018 AAPEX Trade Show

98.     Recognizing the competitive threat posed by Trydel's proprietary, particle-based VT tire sealant, ITWGTR pursed an anticompetitive campaign designed to impede the entry Trydel's proprietary, particle-based VT tire sealant.

99.     In furtherance of its objective to monopolize the relevant market(s), ITWGTR took advantage of the fact that significant legal costs are required to defend against aggressive patent litigation, regardless of the merits of the case, and that such costs can drive the defendant out of the market.  On October 26, 2018, ITWGTR filed an 8-page complaint against Hopkins in the U.S. District Court for the Northern District of Illinois ("the Hopkins Action"), alleging that Hopkins infringed claim 1 of the '041 Patent ("the Hopkins Complaint"). *See* Exhibit 16, Complaint, *ITW Global Tire Repair, Inc., v. Hopkins Mfg. Corp.*, No. 18-7165 (N.D. Ill. Oct. 26, 2018).

100.     On October 29, 2018, the U.S. District Court for the Northern District of Illinois in the Hopkins Action issued a summons as to Hopkins.

101.     In the Hopkins Complaint, ITWGTR alleged that it "manufactures and sells various tire sealant products," including ITWGTR's "Slime" products. Exhibit 16, ¶ 12.

102.     ITWGTR and Hopkins are horizontal competitors in the U.S. tire sealant aftermarket. ITWGTR's "Slime" products compete directly with Hopkins's tire sealants, including Hopkins's Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" and "Tire Repair Kits." ITWGTR and Hopkins compete to sell their products to retailers, such as Walmart, who in-turn sell to consumers.

25

103.   ITWGTR alleged that "its tire sealant products are market leaders, commanding significant shelf space in leading retailers of automotive products such as Walmart, Auto Zone, Pep Boys and Advance Auto Parts." Exhibit 16, ¶ 9.

104.   ITWGTR alleged that Hopkins's Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" infringed claim 1 of the '041 Patent because Hopkins's Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" contained "*glycerin* in a ratio to the total weight of the puncture sealing agent of *between 5 and 75% by weight*." *Id*. at ¶ 18; Exhibit 17, Initial Status Report at ¶ 1(c), *ITW Global Tire Repair, Inc., v. Hopkins Mfg. Corp.*, No. 18-7165 (N.D. Ill. Dec. 10, 2018) (emphasis added).

105.   ITWGTR alleged that "Hopkins intends to aggressively promote and offer for sale" Hopkins's Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" "to retailers and customers of tire sealant solutions" at the "2018 AAPEX industry trade show." Exhibit 16, ¶ 25.

106.   The AAPEX industry tradeshow is the annual Automotive Aftermarket Products Expo  held as part of the annual Automotive Aftermarket Industry Week. The annual Automotive Aftermarket Industry Week, and the annual AAPEX trade show, are usually held around the first week of November in Las Vegas, Nevada, and draw between 100,000 and 200,000 attendees.

107.   The annual AAPEX trade show is one of the largest trade shows for participants in the aftermarket automotive parts and supplies industry. *See* Exhibit 16, ¶ 25.

108.   The annual AAPEX trade show is for the motor-vehicle aftermarket. The motor-vehicle aftermarket (which includes products other than tire sealants exceeds $1 billion. At the annual AAPEX trade show, exhibitors such as ITWGTR and Hopkins can connect with tens of thousands of targeted buyers; can have access to billions of dollars in buying power for their products; can reach key decisionmakers in their target market during one time period and in one

26

location; and can exhibit their products to automotive-parts wholesalers, distributors, and retailers, as well as automotive-service chains and professionals. Attendees of the annual AAPEX trade show participate in the automotive aftermarket and attend the annual AAPEX trade show in order to stay on top of the newest automotive-repair technology and the newest automotive-repair products, including new tire sealants. Thus, products that are displayed, disclosed, advertised, promoted, sold, or offer for sale at the annual AAPEX trade show stand to gain significant market share in the months and years following the AAPEX trade show.

109. The 2018 AAPEX industry trade show took place in Las Vegas, Nevada, from October 30, 2018, to November 1, 2018, featured over 2,500 automotive-aftermarket manufacturers and suppliers as exhibitors, and drew tens of thousands of attendees.

110. At the annual AAPEX industry trade show, exhibitors often secure contracts for the purchase of their products.

111. Hopkins attended the 2018 AAPEX industry trade show. On information and belief, ITWGTR, or an affiliate of ITWGTR, or an affiliate of ITWGTR's parent corporation Illinois Tool Works Inc.—such as ITW Global Investments or ITW Global Brands—attended the 2018 AAPEX industry trade show.

112. Before October 26, 2018, Hopkins intended, planned, and was prepared to display, disclose, advertise, promote, sell, or offer to sell its Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" and other tire sealants containing glycerin at the 2018 AAPEX trade show. The day before the AAPEX trade show opened, Hopkins sales representatives were shown the Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" and other tire sealants containing glycerin. The day before the AAPEX trade show, Hopkins intended to have a display dedicated to its Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" and other tire sealants containing glycerin.

27

Hopkins intended to secure, and anticipated securing, contracts for the purchase of its Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" and other tire sealants containing glycerin. In the weeks and months leading up to the 2018 AAPEX trade show, Hopkins had several meetings with potential purchasers of its products.

113.    Before October 26, 2018, Hopkins's Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" and other tire sealants containing glycerin stood to gain significant market share in the months and years following the 2018 AAPEX trade show.

114.    Trydel, who is Hopkins's exclusive supplier of tire sealants, stood to make a significant number of sales to Hopkins in the months and years following the 2018 AAPEX trade show.

115.    On October 26, 2018, the same day that ITWGTR filed the Hopkins Complaint, ITWGTR emailed a cease-and-desist letter and a copy of the Hopkins Complaint to Hopkins. In its cease-and-desist letter, ITWGTR stated that it did not intend to formally serve Hopkins with a summons and complaint, and ITWGTR allowed Hopkins to respond to the cease-and-desist letter. *See* Exhibit 18, ¶ 2, Motion, *ITW Global Tire Repair, Inc., v. Hopkins Mfg. Corp.*, No. 18-7165 (N.D. Ill. Dec. 7, 2018).

116.    In response to ITWGTR's October 26, 2018 cease-and-desist letter, Hopkins took "certain action" and began settlement talks with ITWGTR. *Id.* at ¶ 5.

117.    Products accused of patent infringement were not permitted to be displayed at the 2018 AAPEX trade show. On information and belief, ITWGTR knew that products accused of patent infringement were not permitted to be displayed at the 2018 AAPEX trade show.

118.    On October 30, 2018, Hopkins removed its display of the Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" and other tire sealants containing glycerin, leaving a visible

28

hole in Hopkins's display. This visible hole prompted attendees of the 2018 AAPEX trade show to ask about Hopkins's tire sealants and caused extreme, industry-wide embarrassment for Hopkins and Trydel.

119.     ITWGTR intentionally timed the Hopkins Complaint and its cease-and-desist letter to have the maximal anticompetitive effect, even though ITWGTR had been aware of Trydel's tire sealants containing glycerin since long before October 2018.

120.     In response to ITWGTR's October 26, 2018 cease-and-desist letter, ITWGTR and Hopkins agreed that Hopkins would not to advertise, promote, sell, or offer to sell its Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" or any other tire sealants containing glycerin at the AAPEX 2018 trade show, in exchange for ITWGTR promising to delay serving Hopkins with the summons and complaint.

121.     As a direct result of ITWGTR's and Hopkins's agreement that Hopkins would not to advertise, promote, sell, or offer to sell its Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" or any other tire sealants containing glycerin at the AAPEX 2018 trade show, Hopkins did not make the substantial number of sales that it would have made but-for the agreement between ITWGTR and Hopkins, thereby causing ITWGTR to retain its dominant, monopoly power in the tire sealant markets.

122.     ITWGTR's and Hopkins's agreement that Hopkins would not to advertise, promote, sell, or offer to sell its Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" or any other tire sealants containing glycerin at the AAPEX 2018 trade show allowed ITWGTR to charge higher prices for its tire sealants containing glycerin than it would have been able to charge, but for the agreement between ITWGTR and Hopkins.

29

123. ITWGTR's and Hopkins's agreement that Hopkins would not to advertise, promote, sell, or offer to sell its Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" or any other tire sealants containing glycerin at the AAPEX 2018 trade show caused Trydel, who is Hopkins's exclusive supplier of tire sealants to not make the substantial number of sales to Hopkins that Trydel would have made, but for the agreement between ITWGTR and Hopkins.

G.     ITWGTR and Hopkins Settle the Hopkins Action

124. Between October 26, 2018, and December 7, 2018, ITWGTR forced Hopkins into agreeing that it: (a) would stop making, using, selling, or offering for sale in the United States any tire sealants containing latex and *any amount of glycerin*, including Hopkins's Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" for the duration of the '041 Patent, and (b) could not even inform or otherwise indicate to the public that any tire sealant products that Hopkins sold contained *any glycerin* unless Hopkins purchased the tire sealant product from ITWGTR.

125. On or about January 18, 2019, ITWGTR and Hopkins agreed in principle to settle the Hopkins Action. Exhibit 19, Updated Initial Status Report at ¶ 1(a), *ITW Global Tire Repair, Inc., v. Hopkins Mfg. Corp.*, No. 18-7165 (N.D. Ill. Jan. 18, 2019). On or about March 20, 2019, ITWGTR and Hopkins entered into and executed a binding written agreement involving settlement of the Hopkins Action.

126. On March 20, 2019, ITWGTR dismissed the Hopkins Action with prejudice pursuant to the settlement agreement.

127. ITWGTR had alleged that Hopkins's Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" infringed claim 1 of the '041 Patent because Hopkins's Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" contained "*glycerin* in a ratio to the total weight of the puncture

sealing agent of *between 5 and 75% by weight*." Exhibit 16, ¶ 18; Exhibit 17, ¶ 1(c) (emphasis added).

128.    However, on information and belief, ITWGTR and Hopkins agreed that Hopkins would stop making, using, selling, or offering for sale in the United States tire sealants containing *any amount of glycerin* for the duration of the '041 Patent.  Upon information and belief, ITWGTR knew that eliminating all glycerin from any future tire sealants would compromise the quality, performance, and longevity of such sealants.

129.    Claim 1 of the '041 Patent did not afford ITWGTR the right to exclude others from making, using, selling, or offering for sale in the United States tire sealants containing *any amount of glycerin.* Rather, claim 1 of the '041 Patent extended *only* to tire sealants containing *between 5 and 75%* of glycerin by weight.

130.    ITWGTR alleged that Hopkins's Bell®-branded "Valve Thru ATV/Off-Road Tire Sealant" infringed claim 1 of the '041 Patent "either literally and/or under the doctrine of equivalents." Exhibit 16, ¶ 19.

131.    A tire sealant containing less than 5% glycerin by weight does not literally infringe claim 1 of the '041 Patent. A tire sealant containing less than 5% glycerin by weight does *not* infringe claim 1 of the '041 Patent under the doctrine of equivalents because prosecution history estoppel *prevents* ITWGTR from asserting that a tire sealant containing less than 5% glycerin by weight is equivalent to a tire sealant containing between 5 and 75% of glycerin by weight.

132.    During prosecution of the '278 Application, proposed claims that included the limitation that the sealant contain 5 and 75% of glycerin by weight were rejected, in part, based on U.S. Patent No. 6,840,990 to Gallagher et al. ("Gallagher"). The Examiner stated that "Gallagher et al disclose sealing compositions comprising glycerin." Exhibit 9, pg. 62. AMI attempted to

distinguish the Gallagher reference over the proposed claims, arguing, "Gallagher does not disclose anywhere that 'the ratio of the glycerin to the total weight of the puncture sealing agent is 5 to 70% by weight.'" *Id*. at 49.

133. The Examiner disagreed with AMI, and maintained the rejection of the proposed claims based on the Gallagher reference. *Id*. at 37. AMI subsequently acquiesced, and agreed to amend the proposed claims by adding an additional limitation that the Examiner had already deemed allowable. *Id*. at 31.

134. Because AMI made arguments or statements in responding to the Examiner's rejection and those statements evidence a clear and unmistakable surrender of subject matter, pursuant to the doctrine of prosecution history estoppel, ITWGTR was estopped from asserting that a tire sealant containing less than 5% glycerin by weight is equivalent to a tire sealant containing 5% or more of glycerin by weight.

135. Accordingly, a tire sealant containing less than 5% glycerin by weight does ***not*** infringe claim 1 of the '041 Patent either literally or under the doctrine of equivalents.

136. ITWGTR knew or should have known that, because of prosecution history estoppel, ITWGTR had no right to assert that a tire sealant containing less than 5% glycerin by weight is equivalent to a tire sealant containing between 5 and 75% of glycerin by weight.

137. Because a tire sealant containing less than 5% glycerin by weight does ***not*** infringe claim 1 of the '041 Patent, either literally or under the doctrine of equivalents, the scope of the agreement between ITWGTR and Hopkins ***exceeds*** the scope of claim 1 of the '041 Patent.

138. Claims 2–9 of the '041 Patent depend from claim 1, and thus the scope of the agreement between ITWGTR and Hopkins ***exceeds*** the scope of claims 2–9 of the '041 Patent.

139.    Claim 17 the '041 Patent is directed to method of producing a tire sealant containing between 5 and 50% of glycerin by weight; and claims 18–21 depend from claim 17. Claim 26 of the '041 Patent is directed to a tire sealant containing between 5 and 50% of glycerin by weight; and claims 27–32 depend from claim 26.

140.    A tire sealant (or a method of producing a tire sealant) containing less than 5% glycerin by weight does ***not*** infringe claims 17–21 or 26–32 of the '041 Patent, either literally or under the doctrine of equivalents; and thus, the scope of the agreement between ITWGTR and Hopkins ***exceeds*** the scope of claims 17–21 and 26–32 of the '041 Patent.

### H.    Trydel Invalidates Claims of the '041 Patent

141.    On June 14, 2019, Trydel filed a petition for *inter partes* review with the USPTO challenging certain claims of the '041 Patent as unpatentable. Trydel did not challenge all the claims of the '041 Patent, but instead challenged those claims that ITWGTR previously asserted against Hopkins.

142.    Because 35 U.S.C. § 311(b) limits the prior art that may be used as the "basis" of an *inter partes* review proceeding to "prior art consisting of patents and printed publications," Trydel's petition challenging certain claims of the '041 Patent addressed only a fraction of the relevant prior art. For example, because AMI's prior art "Slime" tire sealants were not "patents and printed publications," Trydel's petition could not address them even though the claims of the '041 Patent are clearly invalid in view of them.

143.    On December 17, 2019, the PTAB instituted *inter partes* review of the '041 Patent.

144.    On December 14, 2020, the PTAB held claims 1–4, 9, 17, and 20 of the '041 Patent unpatentable, which ITWGTR did not contest on appeal.

145.     On June 29, 2021, the USPTO issued a certificate cancelling claims 1–4, 9, 17, and 20 of the '041 Patent.

## COUNT I
### Violation of § 1 of the Sherman Act (15 U.S.C. § 1)

146.     Trydel incorporates by reference the allegations in Paragraphs 1–145, as though fully set forth herein.

147.     ITWGTR's one or more agreements with Hopkins, pursuant to which Hopkins agreed to refrain from making, using, selling, or offering for sale in the United States tire sealants containing *any* amount of glycerin violates § 1 of the Sherman Act.

148.     Because the scope of the ITWGTR-Hopkins agreement(s) *exceed(s)* the scope of the '041 Patent, the ITWGTR-Hopkins agreement amounts to an unauthorized, illegal, horizontal agreement in restraint of trade.

149.     "It is clear that the patent monopoly is one strictly limited and that contracts and agreements extending its scope may violate federal antitrust laws." *Bendix Corp. v. Balax, Inc.*, 421 F.2d 809, 819 (7th Cir. 1970). "The owner of a patent cannot extend his statutory grant by contract or agreement. A patent affords no immunity for a monopoly not fairly or plainly within the grant." *United States v. Masonite Corp.*, 316 U.S. 265, 277 (1942).

150.     Customers of ITWGTR in the tire-sealant aftermarket have been harmed by ITWGTR's unlawful agreements with Hopkins, by virtue of ITWGTR being able to charge higher prices for its tire sealant products, as well as by virtue of there being fewer choices of tire sealant products.

34

151. Any efficiency-enhancing objectives of ITWGTR's agreements with Hopkins are outweighed by the anticompetitive effects.

152. By reason of ITWGTR's violations of § 1 of the Sherman Act, Trydel has been injured in its business or property, including through the loss of past, present, and future profits, by the loss of customers and/or potential customers, by the loss of goodwill and product image, and by the prospective destruction of its tire-sealant manufacturing business. Trydel has been additionally injured by incurring the cost to invalidate claims of the '041 Patent in an attempt to reign in ITWGTR's unlawful behavior.

153. Accordingly, ITWGTR violated § 1 of the Sherman Act.

154. A judgment that ITWGTR violated § 1 of the Sherman Act, along with an award of treble damages, attorneys' fees, and costs to Trydel, is necessary and appropriate.

## COUNT II
## Violation of § 2 of the Sherman Act (15 U.S.C. § 2)

155. Trydel incorporates by reference the allegations in Paragraphs 1–154, as though fully set forth herein.

156. AMI obtained the '041 Patent by committing fraud on the USPTO.

157. During prosecution of the '041 Patent, one or more people substantially involved in the preparation and/or prosecution of the patent deliberately withheld material information from the USPTO with the intent to, and effect of, deceiving the USPTO and for the purpose, and with the effect of, obtaining a patent that would not have otherwise issued.

158. Cegelski and Sulemanji and/or Lohse committed multiple acts of inequitable conduct: by plagiarizing the specification of the '041 Patent from Kishida, by substantially copying at least one claim from Kishida without disclosing the copied claim to the USPTO, by failing to

identify any of the named inventors of Kishida as inventors or co-inventors on the '041 Patent, and by concealing the prior art "Slime" from the USPTO.

159.    Cegelski and Sulemanji and/or Lohse plagiarized the specification of the '278 Application from Kishida and substantially copied at least one claim from Kishida. Cegelski, Sulemanji, and/or Lohse copied, verbatim at least 85 percent of the specification of the '278 Application from Kishida. Cegelski, Sulemanji, and/or Lohse substantially copied claim 4 from Kishida into the '278 Application, which recites a process for mixing ingredients to make a tire sealant.

160.    Cegelski, Sulemanji, and Lohse did not inform the USPTO that (1) the majority of the specification of the '041 Patent was copied, verbatim from Kishida; and (2) a claim covering a two-step process for producing a tire sealant was substantially copied from Kishida and included in the '041 Patent.

161.    Cegelski, Sulemanji, and Lohse never identified any of the named inventors of Kishida as inventors on the '041 Patent.

162.    Cegelski's, Sulemanji's, and/or Lohse's plagiarism of Kishida and passing it off as Cegelski's and Sulemanji's own work constitutes affirmative egregious misconduct.

163.    Any reasonable examiner would have considered Cegelski's, Sulemanji's, and/or Lohse's plagiarism of the specification of Kishida and the substantial copying of claim 4 of Kishida material to the patentability of the alleged inventions claimed in the '041 Patent, and would have rejected the claims that issued and were later asserted in the Hopkins Action.

164.    Cegelski, Sulemanji, and/or Lohse further committed inequitable conduct before the USPTO by making statements in the '278 Application that it knew were false, including the

false statements in the '041 Patent at column 6, lines 21–50 that glycerin is difficult to mix with rubber latex.

165.    Cegelski, Sulemanji, and/or Lohse copied column 6, lines 21–50 of the '041 Patent from Kishida, but replaced "propylene glycol" in Kishida with "glycerin." It is a scientific fact that it is not more difficult to mix glycerin and rubber latex, than to mix ethylene glycol and rubber latex. Glycerin is highly miscible, including in water and with latex. Glycerin's high miscibility in both water and latex has been well-known known long before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented.

166.    The false statements were material to patentability because, had the USPTO known that, in fact, there is no difficulty mixing glycerin with rubber latex and thus that there is no need for a special process for mixing glycerin with rubber latex, the USPTO would have found the proposed claims unpatentable.

167.    Cegelski, Sulemanji, and/or Lohse made the false statements with intent to deceive the USPTO into granting the '041 Patent. The false statements constitute affirmative egregious misconduct.

168.    Cegelski, Sulemanji, and/or Lohse committed inequitable conduct by not disclosing the prior art Slime products to the USPTO.

169.    Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed tire sealants under the "Slime" brand.

170.    Before 2006, and before the claimed subject matter of the '041 Patent was allegedly invented, AMI manufactured and marketed tire sealants that included, among other things, rubber latex, an anti-corrosion agent, an antifreeze agent, one of more fibers and fibrous materials, a surfactant, a thickening agent, an adhesive agent, and rubber chunks.

171.    Cegelski's, Sulemanji's, and Lohse's failure to disclose the prior art "Slime" tire sealants to the USPTO during prosecution of the '278 Application was material to the patentability of at least claims 1–5, 9, and 26–30 of the '041 Patent.

172.    Any reasonable examiner would have considered the prior art "Slime" tire sealants material to the patentability of the alleged inventions claimed in the '041 Patent, and would have rejected at least claims 1–5, 9, and 26–30 that issued, and at least one of which was later asserted in the Hopkins Action.

173.    ITWGTR has misused its patent rights by knowingly asserting invalid patent claims, and by misrepresenting the scope of its claims. ITWGTR's assertions that the '041 Patent claims cover "***any amount of glycerin***" in the Hopkins Action are ***contrary*** to the statements that the patent applicants made to the USPTO during the prosecution of the '041 Patent in order to overcome the prior art.

174.    ITWGTR's assertion of unenforceable claims was for the purposes, and with the effect of, substantially lessening competition and attempting to create, and creating, a substantial restraint on trade and an actual and/or attempted monopoly in the relevant market(s) described above.

175.    ITWGTR has already obtained, exercised, and/or exploited monopoly power in the tire sealant aftermarket, for example, by asserting the '041 Patent against Hopkins, by securing Hopkins's agreement to stop making, using, selling, or offering for sale in the United States tire sealants containing any amount of glycerin, and by and by stating on its website that it "holds patents for the use of [g]lycerin as an antifreeze agent in tire sealants."

176.    ITWGTR would further obtain, exercise, and/or exploit monopoly power in the tire sealant aftermarket if it were to successfully assert the '041 Patent.

177. At a minimum, ITWGTR's activities give rise to a dangerous probability of ITWGTR achieving monopoly power in the tire sealant aftermarket.

178. ITWGTR has already obtained, exercised, and/or exploited monopoly power in the tire sealant OE market, for example, by asserting the '041 Patent against Hopkins, by securing Hopkins's agreement to stop making, using, selling, or offering for sale in the United States tire sealants containing any amount of glycerin, and by stating on its website that it "holds patents for the use of [g]lycerin as an antifreeze agent in tire sealants."

179. ITWGTR would further obtain, exercise, and/or exploit monopoly power in the tire sealant OE market if it were to successfully assert the '041 Patent.

180. At a minimum, ITWGTR's activities give rise to a dangerous probability of ITWGTR achieving monopoly power in the tire sealant OE market.

181. By reason of ITWGTR's violations of § 2 of the Sherman Act, Trydel has been injured in its business or property, including through the loss of past, present, and future profits, by the loss of customers and/or potential customers, by the loss of goodwill and product image, and by the prospective destruction of its tire-sealant manufacturing business. Trydel has been additionally injured by incurring the cost to invalidate claims of the '041 Patent in an attempt to reign in ITWGTR's unlawful behavior.

182. Accordingly, ITWGTR violated § 2 of the Sherman Act.

183. A judgment that ITWGTR violated § 2 of the Sherman Act, along with an award of treble damages, attorneys' fees, and costs to Trydel, and an order directing ITWGTR to divest one or more portions of its tire sealant business, is necessary and appropriate.

## PRAYER FOR RELIEF

1.     As to Count I, a judgment that ITWGTR violated § 1 of the Sherman Act (15 U.S.C. § 1).

2.     As to Count I, that Trydel be awarded treble damages, attorneys' fees and costs of suit pursuant to § 4 of the Clayton Act (15 U.S.C. § 15(a)) to the fullest extent allowed by law.

3.     As to Count II, a judgment that ITWGTR violated § 2 of the Sherman Act (15 U.S.C. § 2).

4.     As to Count II, that Trydel be awarded treble damages, attorneys' fees and costs of suit pursuant to § 4 of the Clayton Act (15 U.S.C. § 15(a)) to the fullest extent allowed by law.

5.     As to Count II, that ITWGTR divest one or more portions of its tire sealant business.

6.     An order awarding Trydel such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

7.     Pursuant to Federal Rule of Civil Procedure 38(b), Trydel demands a trial by jury on all counts so triable.


Dated: September 20, 2021                    Respectfully submitted,

                                             By:    /s/ Jason S. Shull
                                             Timothy C. Meece
                                             tmeece@bannerwitcoff.com
                                             Jason S. Shull
                                             jshull@bannerwitcoff.com
                                             Brian Apel
                                             bapel@bannerwitcoff.com
                                             Banner & Witcoff Ltd.
                                             71 South Wacker Drive, Suite 3600
                                             Chicago, Illinois 60606
                                             Tel:    (312) 463-5000

Fax:     (312) 463-5001

*Attorneys for Plaintiff*

## EXHIBIT LIST

Ex. 1– ITWGTR's California Secretary of State Records

Ex. 2 - U.S. Patent No. 2,357,650 ("Hall")

Ex. 3  - Chinese Patent No. CN 173073 ("Guihe")

Ex. 4 – U.S. Patent No. 3,352,696 ("Wallace")

Ex. 5 – "Physical Properties of Glycerine and Its Solutions"

Ex. 6 – "Glycerine -An Overview"

Ex. 7 – ITWGTR Website Excerpt

Ex. 8 – U.S. Patent No. 7,388,041

Ex. 9 – Prosecution File History for U.S. Patent No. 7,388,041

Ex.. 10 – Swiss Patent No. 286505 ("Morand")

Ex. 11 – U.S. Patent No. 5,856,376 ("Wong")

Ex. 12 – Chinese Patent No. CN 1062363 ("Haifeng")

Ex. 13 – U.S. Patent No. 6,864,305 ("Kishida")

Ex. 14 – The Tribune, "Maker of tire sealant known as Slime moving to San Luis Obispo"

Ex. 15 – Cegelski and Sulemanji Oaths and Declarations

Ex. 16 – Complaint, *ITW Global Tire Repair, Inc., v. Hopkins Mfg. Corp.*, No. 18-7165 (N.D. Ill. Oct. 26, 2018)

Ex. 17 – Initial Status Report at ¶ 1(c), *ITW Global Tire Repair, Inc., v. Hopkins Mfg. Corp.*, No. 18-7165 (N.D. Ill. Dec. 10, 2018)

Ex. 18 – Motion, *ITW Global Tire Repair, Inc., v. Hopkins Mfg. Corp.*, No. 18-7165 (N.D. Ill. Dec. 12, 2018)

Ex. 19 – Updated Initial Status Report, *ITW Global Tire Repair, Inc., v. Hopkins Mfg. Corp.*, No. 18-7165 (N.D. Ill. Dec. 12, 2018)