IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TRYDEL RESEARCH PTY., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | No. 21 C 4977 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| ITW GLOBAL TIRE REPAIR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**A.**

The plaintiff filed a Motion for entry of a Protective Order on September 28, 2022. Judge Blakey scheduled a motion hearing and the defendant filed a response brief and a corrected response brief. The parties appeared for the hearing before Judge Blakey, and he referred the matter here. For the following reasons, the plaintiff's motion [Dkt. #44] is granted in part and denied in part.

This is a case about tire repair sealant. The plaintiff is charging the defendant with unlawfully trying to extend its monopoly and substantial market power in the relevant tire sealant markets by abusing the patent system and entering into unlawful agreements that constitute unauthorized, illegal, and horizontal restraints of trade. The information at issue includes what the plaintiff calls proprietary tire sealant compositions and formulations, documents relating to research and development of new, proprietary tire sealant products, sensitive financial information, pricing strategies, sales and sales strategies, and proprietary customer information. So, it's antitrust, seasoned with patent infringement.

It seems the tire sealant business involves a lot of confidential information. Both sides have their tire sealant secrets, and both sides want a Protective Order covering certain information to be

provided in discovery. Protective Orders and other sealing devices – once extraordinary – have become unremarkable, common place tools invoked almost as a matter of course. Often, both sides will agree that the provisions of that jurisdiction's "model protective order" – and almost all jurisdictions have one – should govern turnovers of certain confidential information. But not always. This is such a case. The plaintiff wants a Protective Order that provides enhanced protection for this information beyond that contemplated in the Model Protective Order of the N.D.Ill. 26.2. The defendant wants enhanced protection, too, just not quite as enhanced as the plaintiff wants. But the squabble the parties are having over the wording of the Protective Order is about size. The plaintiff is a small tire sealant company. The defendant is a large tire sealant company. The defendant has what it calls a "robust" [Dkt. #51, at 13] – it's not clear what that means – in-house legal department. The plaintiff, apparently, doesn't have any. The wording the plaintiff wants is, we are told, designed to level the litigation playing field between the two. The wording the defendant wants is, not suprisingly, designed to maintain the size advantage the defendant has developed over the years. The parties have been going at it for a few months and have been unable to agree on three size-related points: 1) the scope of the term "competitive-making"; 2) the number of in-house counsel with access to Confidential and Confidential Attorneys' Eyes Only ("AEO") information; and 3) the number of "party representatives" with access to Confidential and Confidential AEO information. [Dkt. #44, at 3; #51, at 3-4].

So, the controversy is about the type of people who can see the secret tire-sealant information and how many. That's where the two sides are after what they say were months of haggling. By failing to work out what has been cast as an almost David versus Goliath controversy, they have necessarily left the resolution of the dispute to the "extremely broad discretion" of the court. *Jones*

*v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013). But it cannot be too strongly emphasized, "discretion" means there are, generally, no "wrong" discovery decisions. Being a range, not a point, discretion allows two decision-makers – on virtually identical facts – to arrive at opposite conclusions, both of which constitute appropriate exercises of discretion. *Compare United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) *with United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996). *See also Mejia v. Cook Cty., Ill.*, 650 F.3d 631, 635 (7th Cir. 2011)("it is possible for two judges, confronted with the identical record, to come to opposite conclusions and for the appellate court to affirm both."); *United States v. Bullion*, 466 F.3d 574, 577 (7th Cir. 2006)("The striking of a balance of uncertainties can rarely be deemed unreasonable...."). So, it always behooves parties to work out their quarrels with a little winning and losing on both sides rather than going to court and risking a complete loss. *See, e.g., Davis v. Mitchell*, No. 19 C 3212, 2022 WL 2073010, *1 ("Absent a negotiated agreement between counsel, the "loser" on a discovery motion might be "right" in the eyes of some decision makers, but "wrong" in the eyes of others."); *LKQ Corp. v. Gen. Motors Co.*, 2021 WL 4125097, at *1 (N.D. Ill. 2021)("Indeed, a party can only overturn a discovery ruling where there has been a mistake of law or an "abuse of discretion." Rule 72(a), Federal Rules of Civil Procedure. As to the latter, it occurs when no reasonable person could agree with the district court's decision."). But, the riskier course is the one the parties have chosen here.

**B.**

Under Fed.R.Civ.P. 26(c)(1)(G), "the court may, for good cause shown, issue an order . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way. . . ." Here, *both* the plaintiff *and* the defendant have their tire-sealant trade secrets, and they are loath to reveal them to too many folks

3

on the other side during discovery. The parties are competitors, and defendant as much as plaintiff, thinks that "disclosure beyond 'attorney's eyes only' is potentially harmful . . . ." *Berkeley*IEOR v. Teradata Operations, Inc.*, No. 17 C 7472, 2020 WL 5230744, at *2 (N.D. Ill. Sept. 2, 2020); *McDavid Knee Guard, Inc. v. Nike USA, Inc.*, No. 08 CV 6584, 2009 WL 1609395, at *5 (N.D. Ill. 2009); *ABRO Indus., Inc. v. 1 New Trade, Inc.*, 2015 WL 13655677, at *2 (N.D. Ind. 2015). As such, the fact that the defendant's response relies on a number of cases about whether there is "good cause" for a Protective Order at all – *see, e.g., Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 858 (7th Cir. 1994); *Tellabs Operations, Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 383 (N.D. Ill. 2012) – or whether parties have adequately shown document disclosure should be limited to attorneys' eyes only – *see, e.g., Motorola, Inc. v. Lemko Corp.*, No. 08 C 5427, 2010 WL 2179170 (N.D. Ill. June 1, 2010)[Dkt. #51, at 4-5, 9-10] – is confusing and at least somewhat hypocritical. The defendant wants a Protective Order with an AEO level of protection just as much as the plaintiff does; meaning, the defendant thinks the tire sealant secrets at stake here are significant, and that if too many people or the "wrong kind" of people get a look at them, it would be hazardous to company health.

The first bone of contention is what kinds of attorneys can look at the secret tire-sealant information. Both sides agree that the other side's attorneys who are involved in "competitive decision-making" must be excluded from access to that information, but, not suprisingly, they differ on what constitutes "competitive decision-making." The plaintiff wants the definition to encompass counsel who are involved in strategies for the development, design, or redesign of tire sealants. [Dkt. #44-1, at 6]. Plaintiff does not want those types of in-house counsel to get a look at the secret information. The defendant, conversely, wants to allow in-house counsel who are involved in

4

guidance concerning product design and redesign, and in applications for, prosecution of, or licensing of intellectual property, including patent rights, to have free access to the secret information. [Dkt. #51-2, at 7].

In *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984), the court defined "competitive decision-making" as "a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Id.* at 1468 n.3. That has become the accepted definition of the short hand term, "competitive decision-making," and it includes, contrary to defendant's proposed definition, "product design." *See, e.g., In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-CV-864, 2019 WL 11583408, at *1 (N.D. Ill. Apr. 25, 2019); *Silversun Indus., Inc. v. PPG Indus., Inc.*, 296 F. Supp. 3d 936, 941 (N.D. Ill. 2017); *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 409 (N.D. Ill. 2006); *Fed. Trade Comm'n v. Advoc. Health Care Network*, 162 F. Supp. 3d 666, 669 (N.D. Ill. 2016). The idea behind the "competitive decision-making" restriction is to shy away from a *per se* bar on in-house counsel accessing confidential information disclosed by a competitor during litigation. *U.S. Steel*, 730 F.2d at 1469 (". . . status as in-house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access."). It is not clear from defendant's response, but perhaps the reason defendant's proposed definition deviates from the accepted *U.S. Steel* definition for no other reason than all its in-house counsel fit within the *U.S. Steel* formulation. So, perhaps, for defendant if the accepted definition includes product design there would result a *per se* exclusion of in-house counsel which would, the defendant argues, run counter to the case law. [Dkt. #51, at 6].

5

But, contrary to defendant's response brief [Dkt. #51, at 7-8], it isn't a *per se* exclusion – not really. The foregoing cases and others like them ask how deeply involved in-house counsel are in each instance. Do they meet the definition or not? That assumes that not all in-house counsel or in-house legal department do. Defendant set up its "robust" in-house counsel department as it wished. It could have compartmentalized it, or not. It could have in-house counsel that don't fall into the definition. Maybe it does, maybe it doesn't. The court has no idea. But, the plaintiff's definition, which follows more closely *U.S. Steel* than the defendant's, is not a *per se* exclusion. And, given the parties' submissions, it is acceptable in this instance.

The fact that defendant also wants a Protective Order with an AEO level of document protection and strict delineation of who gets to see its tire-sealant secrets is a concession that it is difficult, if not impossible, for an individual to compartmentalize information for use in litigation only. If this were not the case, there would be no need for "attorneys-eyes-only" designations in protective orders. Yet they are regularly employed in the case of trade secrets. *See, e.g., Berkeley\*IEOR v. Teradata Operations, Inc.*, No. 17 C 7472, 2020 WL 5230744, at \*2 (N.D. Ill. Sept. 2, 2020); *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 235 F.R.D. 435, 445–46 (N.D. Ill. 2006); *Surface Shields, Inc. v. Poly–Tak Protection Systems, Inc.*, 2003 WL 21800424, \*1 (N.D. Ill. 2003)(ordering production of customer list but allowing party to designate items as "attorney's eyes only" and strongly suggesting that parties enter into agreed protective order regarding alleged confidential information); *Seaga Mfg., Inc. v. Fortune Resources Enterprises, Inc.*, 2002 WL 31399408, \*3–4 (N.D. Ill. 2002)(allowing discovery of customer list subject to "attorney's eyes only" and allowing for removal of that restriction when warranted); *N.L.R.B. v. Cable Car Advertisers, Inc.*, 319 F.Supp.2d 991, 999 (N.D. Cal. 2004)(requiring production subject to a

6

protective order).

The idea is not that in-house counsel do not take confidentiality orders as seriously as outside counsel do. *U.S. Steel*, 730 F.2d at 1468; *Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 406–07 (N.D.Ill.2006). But in-house counsel do stand on different analytical ground than outside counsel and have a unique relationship to the corporation by which they are employed. *Fed. Trade Comm'n v. Advoc. Health Care Network*, 162 F. Supp. 3d 666, 668 (N.D. Ill. 2016). As the court said in *In re PPG Industries, Inc.*, 944 F.2d 912, 1991 WL 191142, at *1 (Fed.Cir.1991), "[r]egardless of an occasional statement of some courts to the contrary, house counsel are subject to pressures different from those which outside counsel face, if only that their own economic well-being is inextricably bound up with their employer's." It is not as though in-house counsel might intentionally disclose confidential information for the benefit of their employers. But, inadvertent disclosure is another matter, and it presents different challenges. The Federal Circuit explained it this way:

> The problem and importance of avoiding inadvertent disclosure is the same for both. Inadvertence, like the thief-in-the-night, is no respecter of its victims. Inadvertent or accidental disclosure may or may not be predictable. To the extent that it may be predicted, and cannot be adequately forestalled in the design of a protective order, it may be a factor in the access decision. Whether an unacceptable opportunity for inadvertent disclosure exists, however, must be determined, as above indicated, by the facts on a counsel-by-counsel basis, and cannot be determined solely by giving controlling weight to the classification of counsel as in-house rather than retained.

*Id.* at 1468.

That is where the definition of "competitive decision-making" comes into play. Where in-house counsel are involved in competitive decision making, in the broad and discerning sense envisioned by *United States Steel*, the risk of inadvertent disclosure is obviously higher than for retained counsel. *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 408

(N.D. Ill. 2006). In that context, compartmentalization of protected information from that which may be properly utilized in competitive decision-making is, to borrow Justice Cardozo's phrase used in another context, "a feat beyond the compass of ordinary minds." *Shepard v. United States*, 290 U.S. 96 (1933). *See Intel Corp. v. VIA Technologies, Inc.*, 198 F.R.D. 525, 531 (N.D.Cal.2000)("good intentions are insufficient to prevent inadvertent disclosure of confidential information because it is not possible for counsel to 'lock-up trade secrets in [her] mind' "). This portion of the plaintiff's motion is granted.

      The parties' remaining disputes are over numbers of persons who can see the secret tire-sealant information. The smaller company, of course, favors smaller numbers. The larger company, just as predictably, favors larger numbers. Again, this is more about size and strategic advantage than it is about case law. There is little to this dispute beyond the smaller company wanting to whittle away the larger company's size advantage, and the larger company wanting to maintain it. It is probably not the type of dispute that should have made it to court, especially where its resolution is going to be a matter of "broad discretion."

      First, the plaintiff wants to limit dissemination to two in-house counsel. Defendant wants that number to be three. Remarkably, this was a decision the lawyers in the case could not work out. Despite an exclusion of "competitive decision-makers," plaintiff argues that the one additional in-house attorney "exponentially" increases the risk of inadvertent disclosure. Apparently, however, not so much that plaintiff sees a similar difference between one and two. This is really only about the fact that plaintiff has no in-house counsel and so wants to take a possible "advantage" away from defendant. The defendant's limitation to three is safe enough. This portion of the plaintiff's motion is denied.

Along the same lines, the plaintiff also wants to limit the number of party representatives to two; the defendant wants six. At least there's a bit more of a difference here and, perhaps, an increased risk of inadvertent disclosure. But, there is no formula for making a decision on the best number, and neither side – perhaps not surprisingly – makes a very compelling case for its number as opposed to the other side's number. So the number shall be four. (While this may well not be an "inspired" number, it constitutes a reasonable exercise of "discretion" and it is well to recall that two judges confronted with identical records can come to opposite conclusions and both be affirmed. *United States v. Banks*, 546 F.3d 507, 508 (7th Cir. 2008). Indeed, substantial discretion ensures inconsistency. *Johnson v. Daley*, 339 F.3d 582, 593-94 (7th Cir. 2003)). On the one hand, again, the safeguards resulting from the "competitive decision-making" restriction should be sufficient for what's at stake here. On the other, defendant gives the court no idea why it needs six – or for that matter, four – employees looking at documents to effectively litigate this case. The defendant has engaged an international law firm with 1000 lawyers stationed in 13 offices around the world, and with 40 lawyers here in Chicago. https://www.willkie.com/offices. The defendant will suffer no disadvantage from today's decision. This portion of the plaintiff's motion is granted in part and denied in part. The parties shall submit a completed Confidentiality Order in keeping with these rulings to the court's proposed order box for entry on the docket no later than November 2, 2022.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/24/22