**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRYDEL RESEARCH PTY. LTD, | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 21 C 4977** |
| | ) | |
| v. | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| ITW GLOBAL TIRE REPAIR, INC. | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

As this case about tire repair spray reaches the end of its third year, the time comes to clean

up some of the mess that was left until the close of fact discovery in March. [Dkt. ##92, 94, 106,

107, 113, 114, 131, 132]. At that time, the plaintiff raised issues with some deposition questions

asked and objected to at a couple of depositions taken in February 2024, and raised a claim that

assertions of privilege made as to documents in a July 2023 privilege log were waived under the

crime-fraud exception. The briefs from the parties were inadequate to make a ruling on those issues

[Dkt. #132, at 9], and it was also clear that the parties had not complied in good faith with Local

Rule 37.2 [Dkt. #92 (indicating the parties had a single meet-and-confer session in regard to disputes

over dozens of questions and well over 200 documents); #107, at 5 (indicating the parties failed to

meet and confer as to plaintiff's challenge to the defendant's privilege log)], so the parties were sent

back to the drawing board. In the month or so that followed, they have managed to specify the

questions and objections that were at issue, but for some reason not identified in the plaintiff's

opening brief. But, as to their obligations under Local Rule 37.2 [Dkt. #132, at 9-10], they have

failed to accomplish anything and, seemingly, have actually made matters worse by increasing the

number of questions and objections for the court to sift through.[1]

## I.

### A.

First, we shall address the plaintiff's challenge to the defendant's assertion of privilege as to about a quarter of the documents listed on the defendant's July 7, 2023 privilege log. The plaintiff claims that the defendant waived any claim of privilege as to those documents under the crime-fraud exception. [Dkt. #92, at 1-2, 14-15]. Before turning to that argument, it has to be said – sadly – that the manner in which the plaintiff has gone about raising its challenge has some earmarks of ambush and misrepresentation. Based on the plaintiff's motion and reply brief, and the defendant's response brief, the parties' dispute over these documents began and ended back in 2022. On June 17, 2022, in a lengthy letter to the defendant, plaintiff objected to defendant's assertions of privilege as to plaintiff's document requests nos. 9, 12, 35–36, 41, and 63–64. [Dkt. #106-2, Pages 12-16/17]. Along the way, the plaintiff argued that:

> Not all opinions, report, or memoranda that address whether any of the Hopkins Accused Products infringe the '041 Patent are protected by the attorney-client privilege or the work-product doctrine. For example, an opinion, report, or memoranda prepared by a non-attorney (e.g., an internal engineer) is not protected by the attorney-client privilege or work-product doctrine.

[Dkt. #106-2, Pages 14/17]. That was not an entirely accurate representation of the law, of course – see, e.g., United States v. Nobles, 422 U.S. 225, 238–39 (1975)(". . . the [work product] doctrine protect[s] material prepared by agents for the attorney as well as those prepared by the attorney

---

[1] It serves the court right for ignoring the instinct – which is ever present – against asking for additional briefing. See, e.g., In re Sulfuric Acid Antitrust Litig., 235 F.R.D. 407, 432 (N.D. Ill. 2006); Morris v. City of Pittsburgh, 445 F. Supp. 981, 982–83 (W.D. Pa. 1978).

2

himself."); *Trustees of Chicago Reg'l Council of Carpenters Pension Fund v. Drive Constr., Inc.*, No. 1:19-CV-2965, 2022 WL 2341290, at *4 (N.D. Ill. June 29, 2022)(". . . plaintiffs have met their burden of showing that the questionnaires were prepared in anticipation of litigation and may be considered work product, notwithstanding the fact that they contain factual information and were largely prepared by non-attorneys."); *Meier v. Pac. Life Ins. Co.*, No. 20-CV-50096, 2021 WL 6125774, at *3 n.2 (N.D. Ill. Mar. 19, 2021)("Courts have also recognized that work-product protection applies to documents created by non-attorneys."); *In re: Fluidmaster, Inc.*, No. 1:14-CV-05696, 2016 WL 6599947, at *16 (N.D. Ill. Nov. 8, 2016)(documents prepared at the direction of counsel re: strategies protected by work product doctrine); *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 220 (N.D. Ill. 2013)("Documents that are written by or for attorneys or that include an attorney's legal advice are covered by the attorney-client privilege . . . ."); *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2010 WL 4622527, at *8 (N.D. Ill. Nov. 4, 2010)(same) – and might call into question whether plaintiff was operating in good faith as required by Local Rule 37.2.[2]

In any event, the parties had conferences regarding the plaintiff's objections on July 5 and 7, 2022. According to plaintiff's July 18, 2022 summarization of those meetings, the parties agreed that defendant would produce non-privileged documents in response to document requests nos. 9, 35–36, 41, and 63–64. [Dkt. #106-3, Pages 2-3/12]. Documents were produced on a rolling basis

---

[2] On the other hand, uncritically taking categorical stances may simply be the plaintiff's wont. As has been seen and will be underscored here, the plaintiff does tend to take a very stark, black-and-white, one-way-or-the-other view of the law. That may work out for the plaintiff in some contexts, but it has questionable value in discovery disputes as the court has attempted to explain previously. *See Trydel, Rsch. Pty. Ltd. v. ITW Glob. Tire Repair, Inc.*, No. 21 C 4977, 2024 WL 2209674, at *4 (N.D. Ill. May 15, 2024).

through August 2023 [Dkt. #72], with defendant producing its final, 930-item privilege log on July 7, 2023. [Dkt. #107-1]. And, thereafter, never was heard a discouraging word regarding that privilege log from the plaintiff for about eight months.

As mentioned in the Memorandum Opinion and Order of May 15, 2024, the parties missed a number of discovery deadlines and were generously granted extensions of those deadlines based on their representations to the court. *Trydel Rsch. Pty. Ltd. v. ITW Glob. Tire Repair, Inc.*, No. 21 C 4977, 2024 WL 2209674, at *1 (N.D. Ill. May 15, 2024). The plaintiff's motion for the proverbial "final extension" came just three days before the scheduled close of fact discovery on February 16, 2024. The plaintiff asked for another month and a half solely and specifically in order to complete two depositions of non-party witnesses and allow for a mediation session. [Dkt. #84, at 2 ("Trydel seeks this extension for the *sole* purpose of permitting additional time to complete remaining depositions."(emphasis added)), 3 (". . . Trydel respectfully requests a modification of the case schedule to permit the parties to take the remaining depositions up to and including March 29, 2024, to accommodate the mediation and to complete the remaining party and non-party depositions.")]. The court granted the plaintiff's motion over the defendant's objection. [Dkt. #84].

Schedules may only be modified upon a showing of "good cause" and with the court's consent, *see* Fed.R.Civ.P. 16(b)(4); *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 895 (7th Cir. 2024), so a party's representations in an opposed motion for an extension of a discovery deadline aren't trivial. Frankly, the plaintiff's representations to the court were not completely frank. As it turned out, the plaintiff withheld the fact that it felt there was anything wrong with the defendant's July 2023 privilege log, and that it was going to be filing two extensive motions to compel that would necessarily trash the new discovery deadline, including the one we are discussing here regarding the

4

defendant's assertions of privilege back in the summer of 2023.

**B.**

Those motions finally came on March 7th and 8th, three weeks after what had been the fact discovery deadline. While it is the March 7th motion that concerns us here, given some of the plaintiff's arguments in that March 7th motion, it's worthwhile recounting a bit about the March 8th motion. It was fully briefed as of March 25th [Dkt. #113] and referred to me a month later. [Dkt. #125].

As some of the foregoing labyrinthine history might suggest, in some instances, the plaintiff's representations to the court have left a bit to be desired. Then came the plaintiff's "Motion to Enforce Agreement on 30(b)(6) Deposition Testimony Entered on Record at April 24, 2024 Hearing." [Dkt. #135]. The motion concerned a purported agreement between the parties as to a number of Deposition Topics the plaintiff raised issues with in its *other* eleventh-hour motion to compel, filed on March 8, 2024. That motion specifically covered Topics 7, 13, 30, 36, 38, 42, 45, 48–51, 71, and 76. [Dkt. ##95, 97]. The parties set about briefing the motion, with the plaintiff filing a reply brief on March 25th which, again, specifically covered Topics 7, 13, 30, 36, 38, 42, 45, 48-51, 71, and 76. [Dkt. ##11, 112]. Defendant was even allowed to file a sur-reply brief on April 8th and, as before, the same Topics remained at issue. [Dkt. ##116, 117, 121].[3] Plaintiff submitted an errata on April 22nd which corrected an error in its reply brief, but there was no correction as to the Topics at issue or mention of any agreement as to any of those topics. [Dkt. #124].

Two days later, Judge Blakey held a hearing on the motions to compel. His referral Order made absolutely no mention of any agreement or that there had been any elimination of any Topics

---

[3]Again, with the additional briefing. *See* fn. 1, *supra*.

at issue since the plaintiff filed its opening brief back on March 8th. The Order simply referred both motions, in their totality and as filed and briefed, to me for resolution. [Dkt. #126]. I acknowledged Judge Blakey's referral a couple of days later, noting that I would be resolving the two pending discovery motions. [Dkt. #127]. I entered the Memorandum Order and Opinion resolving the March 8th motion and all its Topics on May 20th. [Dkt. #134].

Nearly three weeks later, on June 12th, the plaintiff filed its motion to enforce the parties' purported agreement. The motion was a remarkable one in more than one aspect. First, at no point between Judge Blakey's referral on April 24th and the filing of the June 12th motion did the plaintiff make any attempt to inform my chambers that the motion it filed had been significantly truncated by any agreement. As the plaintiff filed the original motion, it was, of course, incumbent upon at least one of the plaintiff's five lawyers to have some regard for the value of judicial resources – and the cost of those resources to American taxpayers, *see, e.g., Chapman v. First Index, Inc*., 796 F.3d 783, 787 (7th Cir. 2015)(the public should not be made to subsidize needless disputes); *Gunn v. Stevens Security & Training Servs., Inc*., 2018 WL 1737518, at *3 (N.D. Ill. 2018)("Here, the taxpayers have been made to subsidize a discovery dispute needlessly."); *see also City of Greenville, Ill. v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014)(noting that "litigants . . . enjoy publicly subsidized dispute resolution . . . .") – and inform the court of the purported agreement and sweeping changes to the issues left for resolution. Many – hopefully most – attorneys would withdraw their original motion and file and file an updated version. Nearly all the rest would likely make a simple phone call or email to chambers. Only a few would show so little regard for a judge's time and simply stand mute and force the court to go through what would have been unnecessary work if not for Judge Blakey's eventual ruling on the motion to enforce. Plaintiff's lawyers,

6

unfortunately, are squarely in that group.

But just as remarkable are the June 12th motion's less-than-accurate characterizations of what occurred. The motion claimed that "[d]ue to a misunderstanding and miscommunication" my order "inadvertently included a portion denying Trydel's Motion with respect to Topics 7, 13, 36, 38, 71, and 76, which was not part of the Magistrate referral." [Dkt. #135, at 2]. The problem was not a "miscommunication" because there was *no* communication on the part of plaintiff's attorneys. The only "misunderstanding" was that of plaintiff's lawyers regarding their duty to the court and the limited resources at a magistrate judge's – any judge's – disposal. I am confident that those resources are far less than those of the plaintiff's law firm.

And there was nothing "inadvertent" about my Order. As Judge Blakey later ruled in rebuffing the plaintiff's "Motion to Enforce" [Dkt. #143], I had ruled on the pending motions that Judge Blakey clearly referred. Plaintiff did "apologize" – in a *footnote* in a pleading directed, not to me, but to Judge Blakey – for not forwarding a copy of the transcript of the April 24th hearing. But, again, there was no need to wait for a transcript or forward anything. All the plaintiff's lawyers had to do was let the court know what had occurred or perhaps withdraw those portions of its motion that were no longer at issue. It's unclear why they chose not to. We'll circle back to all this further on in this opinion but, for now, it's back to the plaintiff's March 7th motion

## C.

Surprisingly, among plaintiff's grievances in the March 7th motion were the defendant's claims of privilege in its eight-month-old privilege log. When a party brings that stale of a challenge to a privilege log and needs to finagle a fifth extension of the discovery deadline in order to do so, it gives the impression that the issue has escaped that party's attention and is perhaps not terribly

important. And that tends to implicate Fed.R.Civ.P. 26(b)(1)'s mandate that discovery be proportional to the needs of the case. But, in any event, here we are.

While the plaintiff's argument is not well-developed, it contends that the crime-fraud exception to the attorney-client privilege applies here because the defendant obtained its '041 Patent by committing fraud on the Patent Office and then sought to enforce that patent in sham-litigation against a third party, Hopkins. As the defendant points out, these assertions essentially echo the plaintiff's allegations in its Complaint. In other words, the plaintiff seems to be saying "we're suing you because we say you did x and y and because we're suing because we say you did x and y, you lose your attorney client privilege."

The crime-fraud exception places communications made in furtherance of a crime or fraud outside the attorney-client privilege. *Vidal-Martinez v. United States Dep't of Homeland Sec.*, 84 F.4th 743, 748 (7th Cir. 2023); *United States v. BDO Seidman*, *LLP*, 492 F.3d 806, 818 (7th Cir. 2007). To invoke the exception, the party seeking to defeat attorney-client privilege must "present prima facie evidence that gives colour to the charge by showing some foundation in fact." *BDO Seidman*, LLP, 492 F.3d at 818; *see also Vidal-Martinez*, 84 F.4th at 49; *BDO Seidman*, LLP, 492 F.3d at 818. The unvarnished idea with the crime-fraud exception is that legal advice relating to past wrong-doing may be covered up, while legal advice relating to future wrongdoing is fair game. *See United States v. Zolin*, 491 U.S. 554, 562–63 (1989)("The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—ceas[es] to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing."); *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 447 (7th Cir.

8

2011)("This exception comes from the recognition that when legal advice relates not to prior wrongdoing, but to future wrongdoing, the privilege goes beyond what is necessary to achieve its purpose.").

As already noted, the plaintiff's invocation of the crime-fraud exception has two facets: a purported fraud on the patent office and subsequent purported sham litigation. In the context of alleged fraud on the Patent Office, "[a] party must establish Walker Process fraud, also known as common law fraud, to successfully pierce the attorney-client privilege under the crime-fraud exception." *Unigene Labs., Inc. v. Apotex, Inc*., 655 F.3d 1352, 1358 (citing *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp*., 382 U.S. 172, 177 (1965)). That means that the moving party has to make a prima facie showing as to the following elements: "(1) a representation of material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to the equivalent of intent, (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation." *In re Spalding Sports Worldwide, Inc*., 203 F.3d 800, 807 (Fed. Cir. 2000).

In a bit of "the Federal Circuit giveth and the Federal Circuit taketh away", the Federal Circuit has said that "making a prima facie showing is not a particularly heavy burden," *Micron Technology, Inc. v. Rambus, Inc*., 645 F.3d 1311, 1330 (Fed. Cir. 2011)(*quoting In re Grand Jury Investigation*, 445 F.3d 266, 274–75 (3rd Cir. 2006)), but has also held – just three months later – that the movant must come forward with "independent and clear evidence of deceptive intent together with a clear showing of reliance" in order to warrant the "extreme remedy of piercing the attorney-client privilege." *Unigene*, 655 F.3d at 1358–59 (*quoting Spalding Sports*, 203 F.3d at 803).

9

The plaintiff has presented nothing resembling "clear evidence of deceptive intent" here, so there will be no need to go into depth on all the elements.

Importantly for our purposes, evidence that someone from the other side left something out of a disclosure to the Patent Office is not enough. There must be clear evidence that that someone did so intentionally. *See Unigene*, 655 F.3d at 1359; *see also Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011)("A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement. . . . In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it."); *Avnet, Inc. v. Motio, Inc.*, No. 12 C 2100, 2015 WL 5474435, at *4 (N.D. Ill. Sept. 16, 2015)(refusing to pierce the attorney-client privilege and work product protection where there was no showing of reliance and "only a prima facie showing of affirmative egregious misconduct . . . ."); *Rowe Int'l v. ECast*, 241 F.R.D, 296, 303–04 (N.D.Ill.2007) (holding that the defendants did not show that any of the privileged communications they sought were made "in furtherance" of a crime or fraud where the law firm submitted documents to the PTO in which the patentholder may not have disclosed the true inventors). After all, because of the rewards such charges might bring, they are commonplace and are improperly but "routinely brought on the slenderest of grounds. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1289-90 (Fed. Cir. 2011). The Federal Circuit has noted that:

> One study estimated that eighty percent of patent infringement cases included allegations of inequitable conduct. . . .Inequitable conduct has been overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system. . . . [T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge

10

> against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps. . . . Left unfettered, the inequitable conduct doctrine has plagued not only the courts but also the entire patent system.

*Therasense,* 649 F.3d at 1289(citations and quotations omitted).

Here, all the plaintiff has is some evidence the defendant may have left out something material in its disclosures to the Patent Office. As with most rulings on discovery disputes, a determination that a party has made a prima facie case is a matter of discretion. *Unigene*, 655 F.3d at 1359. Within that framework, we don't see any evidence of intent here, and certainly don't see any clear evidence.

Significantly, plaintiff makes no mention of the element of intent or scienter at any point in its opening brief. Plaintiff does, however, address that element in its reply brief, arguing that intent can be inferred from omissions and misrepresentations. [Dkt. #113, at 6]. Setting aside for the moment the well-settled, common sense proposition holding that arguments not developed until a reply brief are deemed waived, *see, e.g., Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426, 451 (7th Cir. 2021); *Bodenstab v. County of Cook*, 569 F.3d 651, 658 (7th Cir. 2009), there is a gulf between the case the plaintiff relies on for that proposition and the sketchy presentation just discussed.

In *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333 (Fed. Cir. 2023), the appellate court overruled the district court's entry of summary judgment that the plaintiff had not engaged in inequitable conduct. The district court's ruling – and the appellate court's ruling – had the benefit of extensive briefing and records on summary judgment. Those records included evidence that plaintiff's counsel *knew* that, if his opponent's account of prior art were accepted, the patent would not issue, and evidence that counsel made misrepresentations and misleading statements – a long list, to say the least, 753 F.3d at 1347-51, and well beyond anything we have here – to get around that

11

before the Board of Patent Appeals and Interferences. Still, the appellate court felt that district court needed to go beyond summary judgment and assess the credibility of witnesses. 753 F.3d at 1351. Perhaps this is why I have been unable to find any reliance or mention of the *Ohio Willow Wood* decision in any holding on the issue of the crime-fraud exception. Similarly, in the other case the plaintiff relies on extensively and, to plaintiff's credit, does so in its *opening* brief, the court did not find sufficient evidence to warrant piercing the veil of the privilege until the midst of trial. *Nobelpharma Ab v. Implant Innovations, Inc.*, 930 F. Supp. 1241, 1261 (N.D. Ill. 1996); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1073 (Fed. Cir. 1998). We're a long way from trial, especially if the parties continue to proceed at the pace they have been,

As already indicated, rulings regarding inferences to be drawn in circumstances such as these are a committed to the court's broad discretion in the resolution of discovery disputes. As such, one fact-finder might draw a party's desired inference, while another may not. For example, earlier we recounted some mischaracterizations and, arguably, some misrepresentations the plaintiff has made. The plaintiff might argue these were inadvertent, that they were mistakes, or even that they were negligent but not intentional. But, could another inference be drawn from the plaintiff's conduct? Perhaps, but neither inference would be necessary and either could be supportable.

As far as the other elements, plaintiff simply points to these snippets of evidence without any context, legal or factual. Plaintiff asserts, without more, that disclosure of "Slime" would have precluded the '041 Patent, despite the addition of rubber chunks and swapping propylene glycol for glycerin. [Dkt. #92, at 4]. But, how is the court to know that without anything more? Perhaps the plaintiff assumes that tossing out some rubber chunks and a little glycerin was supposed to send the court on its deep dive into chemistry and applicable patent law. But, it is not a court's task to

research and develop arguments on a party's behalf.  *See United States v. Sineneng-Smith*, ⸺ U.S. ⸺, 140 S.Ct. 1575, 1579, 206 L.Ed.2d 866 (2020)*; Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 842 (7th Cir. 2010). *See also United States v. Gustin*, 642 F.3d 573, 575 (7th Cir. 2011); *Lee v. Chicago Youth Centers*, 69 F.Supp.3d 885, 889 (N.D.Ill. 2014)(collecting cases). And it is certainly not the place of a magistrate judge *overseeing discovery* to independently take up a substantive review of a patent for a party in order to flesh out that party's sketchy case for the application of the crime-fraud exception.  Even flimsier is the plaintiff's reference to the "Kishida Patent" which, the plaintiff concedes the defendant *did* disclose; although apparently not as clearly as the plaintiff thinks the defendant should have.  [Dkt. #92, at 5, n. 4].  Then there is plaintiff's citation to testimony of "Dowel" as to the science behind glycerin and latex flotation. [Dkt. #92, at 6].  Who is Terrence [Dkt. #92-11, page 2/5] Dowel?  Plaintiff doesn't identify him in its brief [Dkt. #92, at 6-7], and he is not identified in the four pages of testimony from his deposition that plaintiff attaches to its brief. [Dkt. # 92-11].  Overall, it's an uninformative presentation and one that hardly merits the extreme remedy of applying the crime-fraud exception. *Unigene*, 655 F.3d at 1359.

We need only briefly touch on the sham litigation facet of the plaintiff's motion.  In terms of sham litigation, "it is the lawsuit's baselessness, combined with the client's subjective intent to interfere with administrative and judicial procedures associated with patent rights, that triggers the crime-fraud exception." *In re Abbott Lab'ys*, 96 F.4th 371, 382 (3d Cir. 2024); *see also Vardon Golf Co. v. Karsten Mfg. Corp*., 213 F.R.D. 528, 535–36 (N.D. Ill. 2003)("Some courts have held that a knowing pursuit of baseless litigation is sufficient to show the fraud element of the crime-fraud exception test . . . . The first prong is satisfied, however, only where the party seeking to circumvent the privilege can show that the very act of litigating was fraudulently being pursued despite 'little

or no legal or factual basis.'"). It would appear that the main – or perhaps only – evidence that there was a knowing pursuit of baseless litigation on the defendant's part is a letter suggesting that in-house counsel was "concerned with sending a Cease and Desist and is seeking outside counsel but also seemed like he was liking the idea of suing for more claims." [Dkt. #92, at 7, 15; #92-8]. This is truly a flimsy reed. Presumably, all lawyers are concerned before initiating litigation, and it is assumed the decisional process will be thoughtful and deliberative. It is assumed that plaintiff's counsel had similar concerns before filing their ill-fated and arguably ill-conceived "Motion to Enforce Agreement on 30(b)(6) Deposition." Filing the motion turned out to be a bad choice, and, to put it delicately, liberties were taken with some of the characterizations made within its pages. The plaintiff would likely say that was zealous advocacy. But, in any event, the court can't say it was it fraudulent.

Accordingly, the plaintiff's motion to compel production of documents listed in the defendant's privilege log is denied.

## II.

We turn now to the parties' battle over the depositions of Mr. Saltzman – defendant's former in-house counsel – and Mr. Mallon – defendant's "Director of Global Operations" and defendant's 30(b)(6) corporate designee. If it is possible to make a hash out of a hash that began as a hash, the plaintiff and the defendant are apparently the ones who could do it. Given the parties' diametrically opposed ideas of what constituted information that would be protected by the attorney-client privilege and/or the work product doctrine, a novice could have seen that these two depositions were going to be messes. That much was clear when the defendant objected to a number of topics two months before the depositions took place.

14

In my experience, under similar circumstances, other attorneys have raised their disagreements as to what was privileged and what was not with the judge prior to depositions where it was clear that so much would be in dispute. Indeed, that is the course the lawyers took in one of the plaintiff's favorite cases – cited throughout plaintiff's submissions – *Lincoln Elec. Co. v. Nat'l Standard, LLC*, No. 1:09 CV 1886, 2012 WL 159940 (N.D. Ohio Jan. 19, 2012). But, that's not the course the parties took here; actually, one should say it's not the course the plaintiff took here as these were plaintiff's depositions, and the plaintiff had the most to lose.

Instead, the plaintiff went ahead anyway and, as could have been predicted by most anyone, objections and instructions not to answer accumulated. Unfortunately, no calls were made to chambers to elicit a ruling or two in order that the matter could be settled and the depositions move forward productive or be truncated. Or, to get a bit more technical, perhaps around the 25th question – or the 30th, or the 40th – that defense counsel felt was seeking clearly privileged information or to which the plaintiff's counsel felt he was clearly entitled to an answer, one side or the other might have availed themselves of Fed.R.Civ.P. 30(d)(3). *See, e.g., Verser v. Barfield*, 641 F. App'x 583, 585 (7th Cir. 2016)(if a party who feels there are abusive tactics being used in a deposition, the "remedy is to move that the deposition be stopped or limited...."). As I put it in *Bierk v. Tango Mobile, LLC*, 2021 WL 698479, at *2 (N.D. Ill. 2021): "So, if plaintiff is taken at its word, several hours were wasted questioning the witness . . . Yet, at no point did plaintiff avail itself of the remedy provided by the Federal Rules. Under Rule 30(d)(3), "a party may move to terminate . . . [a deposition] on the ground that it is being conducted in bad faith . . . ." The fact that plaintiff made no such motion at any point during what it now claims were hours of bad faith conduct undermines its claim that it was so hard done by [deponent] and counsel that "sanctions are warranted." Yet,

15

neither side did.

Instead of calling chambers, the two sides went through the two dispute-laden depositions and plaintiff got a fifth extension of the discovery schedule in order to file a couple of discovery motions, half of one of which was addressed to the conduct of those two depositions. As explained in the Memorandum Opinion and Order of May 15, 2024, the plaintiff presented its broad-brush, superficial idea of the attorney-client privilege and the work-product doctrine, and the defendant followed suit. The plaintiff was unable to even identify all the specific questions and objections it had an issue with, and proceeded on a general basis with the defendant responding in kind. As such, both sides ignored applicable caselaw dictating that such dispute be resolved on a question-by-question basis, which has long been the prescribed method in this and other Circuits. The parties' submissions left the court to guess which questions and answers required a ruling. Obviously, that was impossible, and so the parties were sent back to work to fashion something that might allow the court to make some rulings on their issues.

Along the way, I asked the parties to whittle down their disputes to something more manageable, with perhaps an eye toward limited judicial resources – and proportionality – given the subject matter of the case. Unfortunately, that did not occur. After a month of effort, the two sides have come up with a 73-page, small font submission cataloging 59 questions at issue from Mr. Saltzman's deposition and 33 from Mr. Mallon's deposition.[4] It would appear that, rather than

---

[4] The court has taken it upon itself to number the 92 questions, which seemed a common-sense thing to do. Otherwise, the court would have had to set out each question in full each time it was referred to in this Opinion, which is apparently what the parties thought the court would do. We've cited this case before, but it seems to have been ignored: *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006)("An advocate's job is to make it easy for the court to rule in his client's favor . . . ."). [Dkt. #132, at 4; #134, at 3 n.1].

whittle down their disputes, counsel have "whittled them up", if that's possible. Perhaps it has become apparent to the lawyers in this case why this ought to have been taken care of either before the depositions or early on in the depositions. Regardless of rubber chunks, glycerin, or propylene glycol, it's far too late to mend a tire with a spray can after it's already sustained 92 leaks. But, we shall do the best we can with what has been presented by the parties.

## A.

First, we have to address what seems to be one of the central problems with the plaintiff's perspective on things, and it stems from one of those hoary, legal aphorisms, the old "you-can't-use -the-privilege-as-both-a-sword-and-a-shield." Aphorisms are too often a substitute for analysis and thus can do more harm than good. This particular one isn't even a very good metaphor. Anyone who's watched fencing in the Olympics or in an old swashbuckler film knows that swords are used as shields all the time. It's called parrying. And you won't think a shield can't be used as a weapon if you get conked over the head with one by a Viking or run afoul of Captain America. But, in any event, even in a strictly compartmentalized world of swords limited to one use and shields limited to another, the plaintiff's argument is wrong.

In the plaintiff's version of the "sword and shield" argument, it is plaintiff's own "sham litigation antitrust claim" that has interjected the issue of the adequacy and legitimacy of the antitrust defendant's pre-filing investigation, and so the defendant loses its privilege and work product protection as to all related discovery. [Dkt. #92, at 11-12; #113, at 3]. That's obviously wrong. One shouldn't be the master of whether another party waives its privilege. For a party to waive its privilege and work product protection, sword-and-shield style, it must make an *affirmative* attempt to use communications protected by a privilege to influence a decision maker. *See, e.g.*, *DR*

17

*Distributors, LLC v. 21 Century Smoking, Inc*, 616 F. Supp. 3d 769, 792 (N.D. Ill. 2022); *McCullough v. Hanley*, No. 17 CV 50116, 2019 WL 3776962, at *7 (N.D. Ill. Aug. 12, 2019)("Subject matter waiver is justified when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged materials potentially capable of rebutting the assertion."); *Patrick v. City of Chicago*, 154 F. Supp. 3d 705, 715–16 (N.D. Ill. 2015)("But subject matter waiver generally occurs only where *the party holding the privilege* seeks to gain some strategic advantage *by disclosing* favorable, privileged information, while holding back that which is unfavorable." (emphasis added)); *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1248–49 (11th Cir. 2020)(". . . a party waives the attorney-client privilege when *that party* places privileged information in issue through *some affirmative act* for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." (emphasis added)); *In re Itron, Inc*., 883 F.3d 553, 558 (5th Cir. 2018)(". . . a client waives the privilege by *affirmatively* relying on attorney-client communications to support an element of a legal claim or defense—thereby putting those communications 'at issue' in the case."(emphasis added)); *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc*., 745 F.3d 343, 353 (9th Cir. 2014)("A party who *affirmatively* places its attorney-client communications at issue in a litigation implicitly waives the privilege. The attorney client privilege may not be used both as a sword and shield." (emphasis added)); *In re Sims*, 534 F.3d 117, 132 (2nd Cir. 2008)(". . . we look to see whether the privilege holder took *affirmative* steps to inject privileged materials into the litigation." (emphasis added)).  As formidable as the plaintiff's team of lawyers might be, they are not magicians.  Getting sued by them doesn't make their opponent's evidentiary privileges disappear.

18

The plaintiff also has failed to consider the arena of its imagined sword fight. "[T]he venue of the privilege holder's [disclosures] may be material, for the fairness inquiry focuses on whether there is a risk that some independent decisionmaker will accept [the privilege-holder's] representations without the [adversary's] having adequate opportunity to rebut them." *In re Sims*, 534 F.3d at 132. Judge Johnston over in our Western District put one of his elegantly simple bows on this issue a few years ago when he was still toiling over discovery conflicts as a Magistrate Judge:

> Subject matter waiver is justified when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged materials potentially capable of rebutting the assertion. . . . [As such there is] no subject matter waiver when a deposition witness's answers disclose[] privileged information because there was no attempt to use that previously privileged/now disclosed information to influence a decisionmaker. The mere fact that a party makes a partial disclosure of privileged or protected information in a deposition does not result in a subject-matter waiver because there is no use of the testimony by the party holding the privilege. The critical inquiry is whether protected information has been partially disclosed to a decisionmaker in an effort to influence a decision. Without any use of the previously privileged/now disclosed information, the sword has not been wielded. When a privilege holding party will not or does not use the disclosed information affirmatively to influence a decisionmaker, no subject-matter waiver is found because unfairness is lacking.

*McCullough*, 2019 WL 3776962, at *12–13. *See also United States v. Salerno*, 505 U.S. 317, 323 (1992)("Parties may forfeit a privilege by exposing privileged evidence, but do not forfeit one merely by taking a position that the evidence might contradict."); *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008)("Thus, a defendant may forfeit his attorney-client privilege with respect to certain materials if [he gives] certain testimony at trial before the jury," . . . but he does not forfeit it merely by asserting to his adversary that he believes he has done nothing wrong . . . ."); *United States ex rel. Derrick v. Roche Diagnostics Corp.*, No. 14 CV 04601, 2019 WL 1789883, at *4 (N.D. Ill. Apr. 24, 2019)("At this early stage, [defendant] has broadly pled its affirmative defenses and is entitled to an

opportunity to establish them using non-privileged evidence if it so chooses. . . . Ultimately, the issue of fairness may not be fully explicated or developed until trial [where] [t]he trial judge may have to decide what [defendant] can and cannot say . . . . But that discussion, as explained above, is premature at this early stage of litigation."). As in *McCullough*, we are talking about questions and answers at a deposition. The defendant hasn't affirmatively made use of anything to influence a decision-maker. Thanks to about a half-dozen discovery deadlines the parties have missed, we are nowhere near the point where parties might be influencing decisionmakers at summary judgment or trial.

So, in the context of the depositions at issue, the plaintiff's wielding of the old "sword-and-shield" argument is premature. Obviously, the defendant will not be able to rely on any evidence it hasn't produced in discovery, Fed.R.Civ.P. 37(c)(1), and the defendant may go into battle in the substantive phase of this case – again, if the parties ever get to it – unarmed, if it wishes. It seems extremely unlikely that Judge Blakey or a jury will just take defendant's attorneys' word for it that they conducted a reasonable investigation before filing suit in *Hopkins*, but that will be the defendant's choice. And considering that many of the answers Mr. Saltzman and Mr. Mallon did give to questions about due diligence were along the lines of "I don't remember" or "I don't know", an objective observer might say the defendant is in a lot of trouble once discovery is over. *See, e.g., Nisenbaum v. Milwaukee Cnty.*, 333 F.3d 804, 809 (7th Cir. 2003)("This inability to recall is striking, . . . It amounts to a confession that the suit never had a factual basis."); *Clark v. Takata Corp.*, 192 F.3d 750, 761 (7th Cir. 1999)("[a] party cannot claim a lack of general knowledge about a subject and later make a statement which requires detailed knowledge about the same subject . . . .").

20

That takes care of the bulk of the 90-odd questions and answers the parties have left at issue, but not all. The other overarching problem is the parties' focus on "facts" and what's a fact and what isn't and whether facts are protected by the attorney-client privilege and/or the work product doctrine. The previous Memorandum Opinion and Order, hoped to give the parties a bit of a nudge off their all-or-nothing positions on this aspect of their dispute. After all, Local Rule 37.2 mandates that attorneys negotiate over their discovery disputes "*in good faith*". *Trydel*, 2024 WL 2209674, at *4. But, coming back to court with seemingly even more disputes than they started out with certainly suggests that the lawyers in this case aren't terribly interested in Local Rule 37.2.

Taking a broad, sweeping position and stubbornly maintaining it isn't the best strategy in the discovery dispute context. The court attempted to provide some helpful prodding in its previous Memorandum Opinion and Order, *see Trydel*, 2024 WL 2209674, at *4 (collecting cases), but to no avail. As a result, the plaintiff's continues to insist that facts are never protected by either the attorney-client privilege or the work product doctrine. As the plaintiff puts it, "[i]t is axiomatic that facts are not privileged." [Dkt. #113, at 2]. The previous Memorandum Opinion and Order explained that that position was too broad, *Trydel*, 2024 WL 2209674, at *3, but like other points that were made in that document, it made no impression. So, it needs to be addressed again.

In the attorney-client privilege context, it's far better to say that the privilege protects communications the client makes in confidence for the purpose of legal advice. *See, e.g., Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 446 (7th Cir. 2011); *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). And, it protects communications from the attorney to the client that constitute legal advice or would reveal the substance of a client confidence—directly or indirectly. *See Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397 (7th Cir. 2018); *Rehling v. City of*

21

*Chicago*, 207 F.3d 1009, 1019 (7th Cir. 2000). One can't simply assert that the privilege doesn't ever protect facts. If a client tells their attorney a fact in confidence for the purpose of obtaining legal advice, the attorney can't divulge it at a deposition. But, that doesn't mean the fact, itself, is somehow sacrosanct and that the inquiring party can't discover it by other means.

Then there are facts in the "work-product" context. Again, it is far too sweeping a generalization to say the work product doctrine never protects "facts." As the Seventh Circuit has explained:

> This argument ignores Rule 26, which protects all "documents and tangible things that are prepared in anticipation of litigation." Fed.R.Civ.P. 26(b)(3)(A). It does, however, separate "fact" work product and "opinion" work product. "Fact" work product is discoverable in the rare case where party makes the "substantial need" showing discussed above. Fed.R.Civ.P. 26(b)(3)(A)(ii) (permitting discovery if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means") . . . . But even when a litigant makes the substantial need showing, "opinion" work product remains protected. Fed.R.Civ.P. 26(b)(3)(B) ("If the court orders discovery of those materials [for which a party has a substantial need], it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."). Thus, although there are differing levels of protection for fact and opinion work product, the Federal Rules protect both types.

*Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1023–24 (7th Cir. 2012). In the context of a deposition, the question is whether the answer to an inquiry that seemingly addresses facts would also tend to reveal the type of "intangible" work product that is at the doctrine's core: an attorney's mental processes and opinions. *See Upjohn Co. v. United States*, 449 U.S. 383, 399–400 (1981); *United States v. Nobles*, 422 U.S. 225, 238 (1975); *E.E.O.C. v. Jewel Food Stores, Inc.*, 231 F.R.D. 343, 346 (N.D. Ill. 2005) (finding that an interrogatory request asking for the identities of individuals with information and the substance of the information they possess and statements they have made

does not fall within the work product privilege because it does not reveal anything about the attorney's mental process); *Specht v. Google, Inc.*, 268 F.R.D. 596, 600-01 (N.D. Ill. 2010)(approving deposition questions that did not require attorney to divulge his mental impressions, conclusions, opinions, or legal theories about the case). As was already indicated in the previous Memorandum Opinion and Order, questions about what an attorney thought – whether something infringed or what constituted a reasonable investigation under Rule 11 – clearly target mental impressions; in other words, intangible work product. Even "yes or no" questions about what an attorney decided to do or not do in the course of an investigation can reveal that attorney's thought process regarding a case.

The foregoing takes care of nearly all the disputed questions remaining after the "swords and shields" discussion. But, the defendant has failed to convince the court that testing of the Hopkins product and the results of that testing are off limits. The defendant has not come close to convincing the court that the ingredients or formula of another company's product – and what the defendant knows about it – are beyond the reach of discovery. It's certainly not confidential information from the client. And it's not an attorney's mental impression or opinion. The ingredients and whatever test results might show are pure facts – exactly as the plaintiff says. As such, it's a different type of question than asking "do you think the product infringed" or "what was your basis for sending a cease and desist letter or filing suit." Those types of questions cover a range of legal opinions and mental impressions that the work-product doctrine was designed to protect. It was not designed to protect what's in somebody else's spray can.

There are certainly gray areas among these concepts and gray areas among the questions in dispute. But, as previously explained, that is the idea that underlies the recognition that every

23

discovery decision involves a court's discretion. Accordingly, the plaintiff's motion is granted as to the following questions from the Saltzman deposition:

> What was the basis for the statement in the letter that Hopkins product had synthetic rubber?

> What was the basis for the statement that the Hopkins product had natural rubber?

> What was the basis for the statement that the Hopkins product had fiber?

> Do you know if any test results were actually received by October 26th?

> Do you know for a fact that test results were received in response to this request?

> Did the test results identify the chemical composition of the tire sealant?

> Did the test results identify any synthetic rubber in the tire sealant?

> What evidence did you have, if any, that there was a synthetic rubber in the Hopkins' tire sealant?

> Did you have any evidence at all that there was a synthetic rubber in the Hopkins' tire sealant?

> Did you investigate [that Hopkins' sealant contained synthetic rubber] prior to sending the letter or authorizing it to be sent?

> Did the test results make any statement whatsoever regarding a synthetic rubber?

> Was any testing done to determine the components in the tire sealant?

> Can you tell me anything at all about the testing that was -- that you think might have been performed on the Hopkins product?

As for Mr. Mallon's deposition, the plaintiff's motion is granted as to the following questions:

> What chemical testing was done?

> Okay. So you're the corporate designee in response to the topics in the Notice of Deposition, and you weren't told the type of chemical testing that was performed?

What was the basis for the statement in the letter that Hopkins product had synthetic rubber?

What was the basis for the statement that the Hopkins product had natural rubber?

What was the basis for the statement that the Hopkins product had fiber?

The remaining question is what is to be done. Despite appearances to the contrary – in other words, things like 93 deposition disputes left until the last minute – fact discovery has been closed since March 29, 2024. Given that, and with an eye toward "proportionality" under Fed.R.Civ.P. 26(b)(1), Mr. Saltzman will not be re-deposed. He will instead respond to the foregoing questions in written form. *See* Fed.R.Civ.P. 31. Additionally, the defendant will produce all documents it has withheld regarding testing of the Hopkins product, but may redact, of course, any commentary or mental impression of counsel, or any questions or confidences of the client designed for obtaining legal advice. As for Mr. Mallon, the court has previously ruled that the plaintiff is entitled to answers regarding Topics 48-51, *Trydel*, 2024 WL 2279305, at *6. Adding those to the handful of questions found appropriate here, the plaintiff is entitled to an additional 90 minutes of Rule 30(b)(6) deposition time, perhaps with Mr. Mallon, perhaps with another witness. That will be for the parties to work out.

Mr. Saltzman's answers are due in fourteen days. The additional 30(b)(6) deposition shall be scheduled within the next 30 days. The parties shall also submit an agreed expert discovery schedule no later than thirty days from the date of this Order. After more than two years of discovery and several extensions, any additional fact discovery beyond what is allowed here would not be "proportional to the needs of the case, considering the importance of the issues at stake in the action . . . ." Fed.R.Civ.P. 26(b). As such, there will be no additional fact discovery springing from any of

25

this. To borrow the inimitable words of Judge Seeger in *Boyd v. Pfister*, 18 C 3275 [Dkt. #110]:

"The Court meant what it said when it ordered that 'this extension is the last.' That's why the Court

put it in the Order."

ENTERED: _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 8/27/24

26